## NATIONAL SCHOOL STUDIOS, INC. *v.* MEALEY

[No. 99, October Term, 1956.]

118

*Decided November 5, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ., and HENDERSON, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*C. Oliver Goldsmith* and *Richard S. Wright,* with whom were *Barton, Wilmer, Bramble & Penniman* on the brief, for appellant.

*A. Frederick Taylor* and *Arnold Fleischmann,* with whom were *Smalkin, Hessian, Martin & Taylor* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order dismissing appellant's bill of complaint.

On October 10, 1955, National School Studios, Inc., (National), appellant, filed a bill of complaint asking that Joseph R. Mealey, appellee, be enjoined for a period of thirty months from engaging in school or commercial photography and from soliciting accounts from said schools. On February 10, 1956, an answer, under oath, was filed to that bill by Mealey, in which he gave as his reasons for terminating the contract that National breached the conditions therein by not satisfactorily developing the pictures, and in spite of repeated complaints by him, National refused to improve the quality of pictures and failed to deliver said pictures to him in time to honor the commitments which he had made and, therefore, he was forced to terminate the contract. On March 12, 1956, a temporary injunction was granted by the chancellor covering the territory of Maryland and the District of Columbia, with the understanding that the case was to be heard at once. Interrogatories were filed and answers to interrogatories. Testimony was taken before the chancellor from March 7, 1956, with interruptions, through April 23, 1956. Upon petition filed on March 14, 1956, by leave of court, National's petition for injunction was very slightly amended so that it alleged that the contract relied on "was entered into by and between the parties hereto dated 24 August, 1951," instead of "that on or about the 24th day of August, 1951, a certain contract was entered into by and between the parties hereto" as in the original petition.

On March 29, 1956, an amended answer was filed by Mealey to the amended petition in which he alleged that National did not provide him with the territory set forth in the contract; that National took part of the territory actually assigned him; that he was not permitted to take group pictures; that National had not furnished him with an accurate accounting of salary or commissions earned as well as charges made against earnings since the date of the contract; that National failed to pay him in accordance with the terms of the contract since August 24, 1951; that National failed to supply the equipment, facilities, supervision, sales aids and instructions as called for in the contract; that in spite of advice of the poor quality of the finished pictures National failed and

refused to improve said quality and failed to deliver said pictures promptly; that National refused to permit him to compete with other firms in the same field of endeavor in reference to commissions paid to schools; that National abrogated the contract by abandoning it on or about March 1, 1955; and that National abrogated said contract by requiring him to go to Virginia. In said answer he admitted that he was then engaged in competition with National but did not so compete while he considered said contract in full force and effect. On March 23, 1956, the chancellor dissolved the temporary injunction and on June 13, 1956, dismissed the amended bill of complaint. The appellant appeals here.

National in Minneapolis, a Minnesota corporation, is engaged in the nationwide business of school photography. In order to conduct its business the nation is divided into regional districts which contain one or more states. A regional manager is assigned under a written contract to each region. In order to promote the business of taking photographs of individual students in public and private schools, the prime duty of that manager is to solicit contracts through the principals or headmasters of the schools. Harold W. Orth was the regional manager of the district including Maryland and the District of Columbia at the time of the employment of the appellee, Joseph R. Mealey. As the manager alone could not handle this business he was authorized by the appellant to hire as many assistants as he deemed necessary who were called third party employees. In October, 1946, Orth employed one assistant, Russell Thomas. During September, 1950, it became apparent that the business in Thomas' district was too large to be handled by one employee. Thomas, who objected to the employment of another assistant, was told by Orth that if he did not get someone to assist him, he, Orth, was going to send someone to help him.

Thomas testified that he selected Mealey, twenty-three years of age with no prior experience in this work, who was employed by National in September, 1950, at $75.00 per week with certain allowances for his automobile and other things, which salary was charged to Thomas by Orth. Thomas was given credit for all the pictures taken in Maryland and in the

District of Columbia. Mealey's employment was approved by Orth. Thomas said: "We had a contract and Mealey signed the same kind of contract that I had." That contract is not before us here. Mealey's duties consisted of calling on principals of schools; soliciting contracts for the taking of pictures in the schools; the taking of individual pictures of the students; mailing the films to Minneapolis for processing; returning to the schools again; collecting the money for the pictures which had been paid for, the normal price of which was $2.00; and collecting the undelivered pictures which had not been sold. Ordinarily the schools received a percentage of the sale price which was an inducement to participate in National's plan. Mealey collected the balance and forwarded it to the office in Minneapolis.

In February, 1951, Mealey's salary was raised to $85.00 per week. He testified that he was also to receive in addition a commission of three cents for each "shot" retroactive to September, 1950. Mealey testified that he never received these commissions and that in August or September, 1951, for the first time he signed a written agreement. That agreement is not before us here. He said Orth told him it was the contract that all his men signed. The rate of pay in that contract was greater than that which Mealey was receiving. Mealey said Orth told him at that time that he would think about paying him at that rate of pay later, but he ordered him to sign it because it was a protection for National. Orth had full power to hire and discharge all employees. Mealey said he received no copy of the contract and received no additional duties or compensation. He said he complained frequently to Thomas about National's failure to pay him a bonus amounting to $227.00, which he had won, and the three cents each for all the pictures he had taken since October, 1950. He also complained about these things to Orth whenever he had an opportunity.

In March, 1953, Thomas and Orth invited Mealey to meet with them at Thomas' home to discuss the disagreements and complaints. At that meeting Orth took a memorandum of the terms and Mealey said Orth promised to have a contract written up and a copy sent to him. Mealey said that he never

received a copy. Orth agreed to put him on a salary of $125.00 per week retroactive to September, 1952, so that from that date Mealey would work for $6,000.00 per year, plus five cents for each picture taken up to 40,000 "shots" and ten cents per picture over 40,000. He said that Orth also agreed to account to him for the commissions due him in his first year of work and the prize money. Orth also agreed to give him a check for $500.00 immediately to help him until the accounting took place. Right after the meeting Mealey received a check for $625.00 from Orth. Mealey said $500.00 of this was to be credited to his commissions for the 1950-51 period. He said he never received an accounting of the balance of the commissions.

At this meeting in Thomas' home Orth told Mealey that Thomas' territory had to be split because he could not have two salesmen call on the same schools. A line was drawn through the center of a Maryland road map, going through the center of the city of Baltimore, to show the respective territories assigned to Thomas and Mealey. Mealey testified that the Eastern Shore was part of his territory and was later taken away from him and given to a man named Kinney. It was agreed that there might be some conflict about the line, as it was drawn roughly. A controversy arose about the city of Annapolis. Thomas said he told Mealey that, as he had done quite a bit of work there and knew people there, he was to take Annapolis and all the territory on the east side of the Ritchie Highway. Mealey was still a direct employee of Thomas at that time. However, Thomas and Orth reached a private agreement whereby Orth would contribute $2,000.00 to Mealey's salary.

In February, 1954, at a teachers' convention in Atlantic City, Orth submitted contracts to all his salesmen which were similar to the contract signed by Mealey on August 24, 1951, and this new contract was dated back to August 24, 1951. Mealey refused to sign the contract because there was nothing in it about the $6,000.00 per year which was to be guaranteed to him under the last agreement. This new contract provided for a drawing account of $100.00 per week which was equivalent to $5,200.00 per year. Mealey also complained

that the contract was for the entire State of Maryland and he wanted his territory set apart from Thomas'. Mealey told Orth he would not sign the contract. Orth replied that if he did not sign it he would not send him any more checks. Mealey took the contract home and after thinking about it for a week or ten days received a letter from Orth demanding that he return the contract right away and further stating: "If you are going to stick with me, let me know." Thereupon Mealey returned the contract signed and later received a signed copy of it from Orth.

The contract, Exhibit 3, which is the contract before us in this case, dated August 24, 1951, between National as employer, Orth as second party employee, and Mealey as third party employee, contained, among other things, the following provisions which are pertinent to this case: The employer had been for a long time engaged in the business of photography. Orth had heretofore executed an employment contract with the employer and desired to obtain the assistance of Mealey to aid in promoting the business of National in the territory assigned to Orth. Mealey agreed to make personal contact with the established trade and develop new business. Mealey further agreed "* * * during his employment and for a limited time after the termination thereof, that he will not become engaged in a competitive business or be employed by a competitor, either directly or indirectly, within the territory assigned to him and that he will not, directly or indirectly, solicit business from the heretofore established or future trade of the employer which may be developed by either employee, and the third party employee agrees that, in the event that he violates the restrictions imposed under this agreement, the liquidated damages herein provided for will be paid by the employee to the employer unless the third party employee is enjoined against continued violation." Mealey agreed to devote his entire time to the promotion of his employer's business in the territory assigned to him and not to enter the territory of any other employee for the purpose of soliciting business. The territory assigned to Mealey within the territory assigned to Orth was stated to be: "The State of Maryland and the District of Columbia." National, during the term of

124

employment, agreed to advance to Mealey the sum of $100.00 per week and to advance to him all film and necessary equipment required by him in the performance of his duties. National agreed, at its discretion, to furnish Mealey equipment for group photography. Orth agreed to pay Mealey, out of the money collected from the sale of finished photographs taken by Mealey within the territory assigned, a schedule of rates specified in the contract. It was further agreed by Mealey in Paragraph VIII that he would "not, at any time, while in the employ of the employer and/or within thirty (30) months after leaving its employ within the territory assigned, either for himself or for any person, persons, firm or corporation, or in any manner whatsoever enter into the territory herein defined, for the purpose of contacting or soliciting present and/or future customers of the employer or attempt to obtain their patronage for a similar or competing business. Said employee shall not, in any manner whatsoever, directly or indirectly, solicit, divert, take away from or attempt to solicit, divert or take away from any of the customers business or patronage of the employer within said territory while the relationship of employee and employer exists and for a period of thirty (30) months after terminating same. If the said employee violates the provisions of this paragraph, he is to pay to the employer the liquidated damages herein provided for. * * * In the event that this agreement is terminated for any reason whatsoever and the third party employee violates the provisions of Paragraph VIII, the employer shall have the right to apply to any Court of competent jurisdiction to enjoin the said employee from continuing a breach of this contract, or the employer shall have the alternative remedy of demanding the payment of damages, and it is agreed between the parties that the damages so sustained by the employer are uncertain, speculative and difficult of ascertainment and that the parties, therefore, agree upon a method of determining the damages sustained by the employer and it is agreed that the amount so agreed upon is reasonable and shall be determined to be liquidated damages and not a penalty. * * * This agreement shall remain in force until the 24th day of August, 1952, and from year to year there-

after unless terminated by the employer or second party employee for cause or by the third party employee by giving thirty (30) days' notice in writing to the employer and by paying all charges due the employer from the third party employee and surrendering all equipment furnished by the employer, together with records or information which the third party employee has which is in any way related to his employment under this agreement. * * * Wherever notice is required to be given under the terms of this contract, it shall be in writing and sent to the respective parties by registered mail addressed to the last known address of the party."

From that time on Mealey continued to work as before with no change in duties and received usually $125.00 per week for about forty-five weeks. It was sometimes reduced to $100.00 per week in the summer, although the contract itself provided for $100.00 per week. Mealey testified that he still complained about the failure to pay him the balance of the commissions for the 30,000 pictures and said Orth promised to pay him the balance of the commissions due and also an accounting.

Mealey testified that beginning in the fall of 1953 he received an increasing number of complaints about the quality of National's photographs, particularly in their development and printing. Mealey passed these complaints on to Thomas, his immediate superior, and after the spring of 1954 to Orth when he became his immediate superior. There were also complaints from the principals of schools about the failure to deliver the promised photographs on schedule. One of such instances was when Mealey and Thomas were required to pick up a Christmas shipment of photographs at the Washington airport and deliver them all night, in order to have the pictures distributed before the Christmas vacation began. Mealey said Orth told him he was taking the Eastern Shore territory away from him and giving it to Joseph Kinney because Kinney worked in Delaware and it would be much easier for him to go from Delaware to the Eastern Shore. Orth testified that Mealey never complained about this and that Kinney was merely allowed to take pictures on the Eastern Shore and Mealey still had the right to do so. Mealey

admitted that he took pictures in Cecil County in February, 1955. Mealey also complained that he never received all his commissions and was not provided with the sales aids, assistance and instructions, as provided in the contract.

On March 1, 1955, Orth wrote a letter to Mealey in which he stated that competition was getting to be serious and that he was going to split the sales organization or continue in a different manner. He asked him to be at his office on March 5th. He also stated: "I plan to put everybody on salary. Have some idea in mind when you come in as to how much you will work for. If we can't get together on these prices, we'll simply split the organization up and you can go your way and I will handle things the way I see best from here. Actually, what I am trying to do, is protect the fellows that have really been in this business for a number of years and have done a good job." He enclosed a check for $125.00. Mealey appeared in response to that letter. He continued to get his weekly drawing account but claimed that this was on account of past pictures he had taken. He said he had no idea how long he was going to be employed by National and he was therefore thinking about going into business for himself. Although he did not at that time solicit for his own account, he discussed the possibility of going into business on his own with some of the school principals, and he asked some of them, if he quit and went into business for himself, what people would think of it. He said the reaction was "pretty good at the time". He also found someone who would develop his pictures.

On March 29, 1955, Orth wrote Mealey another letter, in which, among other things, he stated: "I have been intending to write and did try to call you several times. It seems that Russ is not particularly anxious to work Virginia. I know that you have made a few calls down that way and have one or two schools promised. It seems to me he is letting a good opportunity go by the board. Naturally, I can't do too much until I find out definitely what he plans to do, so the time has come when I plan to do it for him. Perhaps I hurt his dignity a little bit when I suggested that Mealey call in Virginia and since he doesn't have much to do during the Fall, he

could shoot the pictures for you. * * * We are sending a pad that I would like made out on each and every call you make the rest of this Spring. I don't want these on calls where there is no interview or you left dating notices. Also, send me your daily reports each day. If you will do this, I will guarantee you will have a better future with the company. The time has come when the fellow making the calls has got to have some consideration. I will be in Cleveland with Rothgeb until next Tuesday, April 4th. When I come back I will contact you and give you a definite answer as to how we'll be working next year." He also enclosed a check for $125.00. No such answer was given by Orth to Mealey.

Mealey stated that after he received numerous cancellations of pictures and on account of his uncertainty about the future, without notice he quit his job on September 24, 1955. He then commenced to compete with National in the same business. The appellant in its brief states that in appellee's telegram resigning his position the reason given was "numerous cancellations". We are unable to find this telegram in the record or the transcript. The chancellor reached the conclusion that these letters of March 1st and March 29th constituted sufficient justification for Mealey's resignation.

As to Mealey's contention that he was not permitted to take group pictures, the contract provided that the employer might, in its discretion, make available to Mealey equipment for group pictures. It was not bound to do so. The solicitor for the appellee stated "that the group pictures are not at issue in this case". As to the contention that Mealey was not given a proper accounting, he admitted that he complained only once or twice in writing to the appellant about the accounting, although he received monthly notices of his drawing account and charges. The chancellor made no finding that National owed Mealey money. Appellant offered to have any certified accountant of Mealey's choice examine National's books and records. This offer was not accepted. It appears that there was an adjustment of accounts at one time. As to whether National provided Mealey with the territory set forth in the contract, we are of opinion that the appellee agreed to this division and it was done for the convenience of the two

salesmen, Thomas and Mealey. Apparently Mealey did not complain as to this division. Mealey frequently took pictures in the territory assigned to Thomas and Thomas took pictures in the territory assigned to Mealey. In spite of this tentative division both men worked in Thomas' original territory. The chancellor found that the division was rather indefinite. Mcaley stated that he and Thomas had agreed to some territorial division in Baltimore City and it took a few months to actually pinpoint the exact division. In reference to the Eastern Shore territory, while Mealey stated it was taken away from him, this was denied by Orth. Mealey testified that in one of the divisions of territory the Eastern Shore was included in his territory, and at the second division this was taken away. He said he never agreed or disagreed to this second division and did not send Orth a map and list of the schools on the Eastern Shore for six months after Orth requested it by letter. As to Mealey's complaint about the unsatisfactory pictures, the chancellor was doubtful whether this contention was sound and made no specific finding on that point. Of course, unsatisfactory pictures may be caused by the fact that they were not taken properly, or because the processing was not proper. We do not find that there is proof as to what caused these defects. The defects may have caused the delay in delivery. There was no finding by the chancellor that National failed to supply equipment and sales aids, although he did find that Orth was difficult to deal with.

It is significant in this case that the original answer filed by Mealey under oath alleged only two grounds for the termination of the contract, one being the quality of the pictures and the other delay in deliveries. Rule 17, of the General Equity Rules of this Court, provides that the chancellor at any time before final decree may permit an answer to be amended. However, as contended by the appellant, the original answer should be considered in weighing the later defenses. It was said by Judge Hammond in *Foard v. Snider*, 205 Md. 435, 448, 109 A. 2d 101: "It has been repeatedly held that a denial of liability on one ground may be a waiver of the right to rely on another." The written contract, here before us, was evidently changed in some respects from time to time orally

by agreement of the parties. Thereby Mealey waived the defenses which he now asserts. He continued, from all his actions, to consider the contract as modified in full force and effect until he cancelled it without notice.

In *Freeman v. Stanbern Construction Co.,* 205 Md. 71, 106 A. 2d 50, the appellant contracted with the appellee to plant shrubbery and trees. The contract contained a guaranty by appellant of all shrubs and trees for one year or one growing season, and in the event of failure of any of the plants the appellant promised to make replacements. The contract provided further that it could only be modified in writing and that all workmanship and materials would be subject to rejection by the F. H. A. inspector. The parties also agreed that the planting would only be done during favorable weather conditions. Later the appellee orally promised the appellant that if he would plant the trees and shrubs before a certain date, (although at that time weather conditions were not proper) he would relieve the appellant of the guaranty provision. The appellant proceeded to plant the trees and shrubs, many of which had to later be replaced by the appellee. In an action by the appellee to recover on the guaranty, it was held that the guaranty, as well as the requirement of F. H. A. approval, had been waived by the mutual assent of the parties and evidence of the subsequent oral agreement was admissible. See *Atwell v. Miller,* 11 Md. 348; *Allen v. Sowerby,* 37 Md. 410; *Fusting v. Sullivan,* 41 Md. 162; *Linz v. Schuck,* 106 Md. 220, 67 A. 286, 11 L. R. A., N. S., 789, 124 Am. St. Rep. 481; *Dickson & Tweeddale v. Fowler,* 114 Md. 344, 79 A. 519; *Furness, Withy & Co. v. Randall,* 124 Md. 101, 91 A. 797; *Hercules Powder Co. v. Campbell,* 156 Md. 346, 144 A. 510, 62 A. L. R. 1497; *Evergreen Amusmt. Corp. v. Milstead,* 206 Md. 610, 112 A. 2d 901.

Mealey apparently did not consider that he was discharged by the March letters. After the receipt of those letters he was paid in the same fashion as before. When asked if anything changed after those letters he stated "the relationship between Mr. Orth and myself". On June 3, 1955, Mealey ordered report blanks presumedly to use in continued work with National in the autumn. He accepted checks from his employer

during June, July, August and September. The contract, which bore the date of August 24, 1951, by the provisions thereof, renewed itself from year to year unless terminated by National or Orth for cause or by Mealey giving thirty days' notice in writing to National. Although he relies on the March letters, he gave no notice to National before August 24, 1955, of his intention to quit. He states that two or three days after he received the March letters he went to a meeting at Newark where Orth was present. He gave no notice of his intent to quit at that time. On July 19, 1955, Orth wrote appellee about the meeting to be held in Minneapolis early in August and requested him to attend the meeting, suggesting that he ride in an automobile with three other men to save expenses. He further stated in the letter: "As to the expenses in Minneapolis, I can make arrangements to get one large room that would be air-conditioned and hold about six. The food will be on Rothgeb [President of National] and he usually, after the meeting is over, has that so-called 'giggle juice'. Suggest you let me know right away, so that I can arrange for lining up which cars which fellows go in. This is a must! If you want to be part of this company, be at the meeting." Mealey attended that meeting. He also attended a meeting at Orth's office in August. The appellee admitted receiving a letter from Orth on September 13, 1955, enclosing a check in the amount of $125.00.

It is stated in *Williston On Contracts,* Rev. Ed., Volume 3, Section 688, page 1983: "The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to." In *Restatement of The Law of Contracts,* Section 309, it is stated:

> "Where the duty of a party to a bilateral contract has been discharged by the failure of a condition to exist or to occur or by the actual or threatened non-performance of a return promise, he is again subjected to the duty if he renders any further perform-

ance, or assents to the rendering by the other party of any further performance of a condition or promise beyond what is due as the exchange for performance previously rendered, provided that he renders or assents to such further performance

(a) with knowledge of the facts establishing his discharge, or
(b) without such knowledge, if
    (i) within a reasonable time after acquiring knowledge he fails to notify the other party that he asserts a discharge, or
    (ii) the other party, not then having received such notification, materially and reasonably changes his position to such an extent that it would be unjust to allow a discharge."

Section 298 states:

"(1) A promisor's duty is not discharged by the defective performance of a condition or of a return promise if he accepts the performance with knowledge of or reason to know of the defects, or retains it for an unreasonable time after acquiring such knowledge or reason to know, unless the performance is so attached to land or chattels belonging to him that the detachment would cause him material expense or injury."

It has been held in this State that one may waive the breach of the contract and later be bound by his election. *Key v. Dent,* 6 Md. 142; *Orem v. Keelty,* 85 Md. 337, 36 A. 1030. "He who is silent when he ought to have spoken, will not be heard to speak when he ought to be silent." *Jaworski v. Jaworski,* 202 Md. 1, 10, 95 A. 2d 95; *Burke v. Burke,* 204 Md. 637, 647, 106 A. 2d 59. In *Hauser v. Watson,* (Mun. Ct. App. D. C.), 60 A. 2d 698, cited by the appellant, Hauser was employed on a salary plus commission basis, a bonus and other benefits. The owner of the company, when he heard of

the basis of Hauser's employment, objected to paying some of the benefits promised and the employee was notified that he would not be paid the amounts to which the owner objected. The trial judge held that when Hauser received notice he would not be paid all the amount promised, he was under an obligation to elect whether he would continue in this employment and that he elected to do so by continuing in the employment. The Appeal Court, in holding the ruling correct, said: "The employer in this case did modify the terms of employment by limiting the basis of compensation. And the employee's assent to the modification was clearly indicated by his acts and conduct in electing to forego commissions and to accept larger sums as bonus payments during the year and a half that he continued on the job. This was no mere acquiescence by silence; it was a deliberate election by one who had full and free power of election. The law will not permit one who has made such an election and accepted its benefits to wait until he leaves the employer's service and then claim that he was not bound by his own conduct." See also *Conway v. White,* (C. C. A. 2d), 9 F. 2d 863; *Specialties Development Corp. v. C-O-Two Fire Equip. Co.,* (C. C. A. 3rd), 207 F. 2d 753; *Gray v. Maryland Credit Finance Corp.,* 148 Pa. Super. 71, 25 A. 2d 104; *La Miller v. St. Claire Packing Co.,* 99 Cal. App. 2d 518, 222 P. 2d 75.

We cannot find in this case that there was any failure of National in any particular of its promised performance of the contract which was not waived by Mealey. Nor do we find that the letters of March 1, 1955, or March 29, 1955, constituted a dismissal by Orth of Mealey.

A bill for an injunction under the terms of a contract in this State has been considered as a bill for the specific performance of the covenant in the contract. *Western Md. Dairy v. Chenowith,* 180 Md. 236, 23 A. 2d 660; *High on Injunctions,* (4th Ed.), Section 1134; *Pomeroy on Equity Jurisprudence,* (5th Ed.), Section 1341. An application for a decree for specific performance of a contract is addressed to the discretion of the court. Such a decree is not a matter of right but rests in the sound discretion of the court to be granted or refused according to the circumstances of the case.

It is as much a matter of course for an equity court to decree specific performance of a contract as it is for a court of law to award damages for its breach. *The Glendale Corp. v. Crawford,* 207 Md. 148, 154, 114 A. 2d 33, and cases there cited.

The business in which National is engaged is of a highly competitive character. Its maintenance and growth in a particular territory depend upon the personal relationship between its salesmen and school principals with whom the salesmen have contact. This is National's greatest asset. Such contacts give to the employee a relationship by which he can transfer the customers from one employer to another. *Tolman Laundry v. Walker,* 171 Md. 7, 187 A. 836. The injunction provision was probably the most important feature to National. There is no testimony that there was any change in the contract as to the right of the employer to obtain an injunction. Mealey admitted that before he resigned his position he contacted some of the school principals with an idea of transferring the business to himself. We are therefore of opinion that Mealey should be immediately enjoined as prayed by the appellant, from engaging in school photography (but not from commercial photography having no connection with school photography) within the territories of the State of Maryland and the District of Columbia until March 24, 1958.

> *Decree reversed, with costs, and case immediately remanded for the issuance forthwith of the injunction as specified herein.*