ROLAND, TO OWN USE AND USE OF HARTFORD ACCIDENT & INDEMNITY COMPANY *v.* LLOYD E. MITCHELL, INC.

[No. 18, September Term, 1959.]

*Decided November 23, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Benjamin G. Miller,* for appellant.

*Grafton D. Rogers,* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

Roland, the plaintiff-appellant, brought this suit to his own
use and to that of an insurance carrier which had made pay-
ments to him in accordance with a Workmen's Compensation
award, against his employer, Hardinge Co., Inc. (Hardinge),
Lloyd E. Mitchell, Inc. (Mitchell) and Esso Standard Oil
Company (Esso) for injuries sustained by Roland as a result
of an explosion while he was working on the premises of Esso.
This appeal is from a summary judgment in favor of Mitchell.
The suit has not been determined as against the other defend-
ants.

The question chiefly argued on this appeal was whether the
relationship between Hardinge and Mitchell was that of seller

and buyer or of subcontractor and prime contractor. The judgment of the trial court was based upon a finding that the relationship was of the latter type. Since the judgment was a summary judgment, its correctness depends upon whether or not the undisputed facts and the inferences therefrom support this finding. If they do so, the judgment was correct; if they do not, Mitchell was not entitled to judgment as a matter of law.

We do not think that there is any dispute with regard to the law as to whether Roland can or cannot maintain his suit against Mitchell once the relationship between Hardinge and Mitchell with respect to the work in which Roland was engaged at the time of the injury is definitely determined. If the relationship between Hardinge and Mitchell was that of subcontractor and contractor, Mitchell would be a statutory employer of Roland by virtue of Code (1957), Art. 101 (the Workmen's Compensation Act), § 62 and, under § 15 of that Article Roland's exclusive remedy would be under that Act. *State, Use of Hubert v. Benjamin F. Bennett Building Co.,* 154 Md. 159, 140 A. 52; *State, Use of Reynolds v. City of Baltimore,* 199 Md. 289, 86 A. 2d 618; *Kegley v. Vulcan Rail & Construction Co.,* 203 Md. 476, 101 A. 2d 822. On the other hand, if Mitchell was not a statutory employer of Roland, the latter might maintain this tort action against Mitchell for alleged negligence in accordance with § 58 of the Workmen's Compensation Act. *M. A. Long Co. v. State Accident Fund,* 156 Md. 639, 144 A. 775; *Ryan v. Bethlehem Sparrows Point Shipyard, Inc.,* 209 F. 2d 53 (4th Cir., 1953).

There is also, we think, no doubt as to the law governing the granting of a motion for summary judgment applicable to this case. If the relationship of Hardinge to Mitchell with regard to the work in which Roland was engaged when injured is shown by the undisputed facts and inferences therefrom to have been that of subcontractor and contractor, then as a matter of law Mitchell was entitled to judgment, and the summary judgment in Mitchell's favor was properly entered. Maryland Rules, Rule 610 d; *Frush v. Brooks,* 204 Md. 315, 104 A. 2d 624; *Strickler Engineering Corp. v. Seminar, Inc.,* 210 Md. 93, 122 A. 2d 563; *Concord Co. v. Matherly,*

216 Md. 453, 140 A. 2d 900; *Mullan Contracting Co. v. International Business Machines Corp.,* 220 Md. 248, 151 A. 2d 906. On the other hand, if there was a genuine dispute as to any material fact, summary judgment could not properly be granted. *Cox v. Sandler's Inc.,* 209 Md. 193, 120 A. 2d 674; *Burrell v. Frisby,* 212 Md. 181, 129 A. 2d 75; *Tellez v. Canton Railroad Co.,* 212 Md. 423, 129 A. 2d 809. Furthermore, in a summary judgment proceeding, even though the underlying facts may have been undisputed, if they were susceptible of more than one inference, the party against whom inferences were sought to be drawn (Roland) was entitled to the inferences most favorable to his contentions. *White v. Friel,* 210 Md. 274, 123 A. 2d 303, and cases therein cited.

The facts as shown by the printed record extract are presented through affidavits and documentary evidence. They are summarized below. We have also added information derived from one deposition (relied on by Mitchell) as to the nature of Roland's work at the time of his injury.

Esso entered into a contract with Mitchell under which Mitchell agreed to furnish all material, superintendence, labor and equipment for the construction of certain facilities at Esso's Baltimore Refinery, including "the designing and erecting of two * * * separator settling tanks and flight scrapers in the existing No. 3 Separator with attendant equipment." Mitchell undertook to install the equipment.

Mitchell entered into a contract with Hardinge for the purchase of the flight scrapers and attendant equipment. Most of the terms of that contract are set forth in a proposal from Hardinge to Mitchell, which the latter accepted or purported to accept by a purchase order containing some additional terms that were apparently agreed to by Hardinge. The proposal called for the delivery of the equipment "f.o.b. cars [at York, Pennsylvania] * * * in good shipping order" at a specified price. The proposal did not call for any installation work by Hardinge. It provided under the heading "Drawings" that Hardinge should furnish "assembly and erection drawings, and operating instructions." It also contemplated that Mitchell should furnish "any information

needed to build the material to suit the local conditions, all subject to the conditions herein set forth" and shipment was to be "in 16 to 18 weeks from receipt of order and all pertinent engineering information." Other terms of the proposal included provisions that "all materials defective either in labor or material are to be duplicated f.o.b. works where made [York], without charge, when examination proves the claim, but no other claims for damages or for labor will be allowed by * * * Hardinge * * *", and that "[n]o allowance will be made for repairs or alterations unless made with the written consent and approval of * * * Hardinge * * *." Mitchell's purchase order referred to Hardinge's proposal, identified the place (Separator No. 3 at the Esso Refinery, Baltimore) where the equipment was to be used, provided that the equipment should be delivered to Mitchell, c/o Esso, at Baltimore, and also provided that the equipment was to be in addition to and identical with certain identified units previously furnished for use at the same place. This, we suppose, furnished all necessary construction and engineering data. The purchase order also contained clauses providing: (a) that all material covered thereby should be shipped prepaid; (b) that if the seller's quoted terms were f.o.b. point of shipment [as they were], the cost of freight should be added to the invoice; and (c) that "there was no other agreement, written or verbal, between the parties pertaining to this purchase order."

After the Hardinge equipment had been installed by Mitchell, Esso informed Mitchell that the scrapers did not operate properly and Mitchell notified Hardinge of this. Hardinge replied that it had no machinists available to do the work of getting the equipment to operate properly and requested Mitchell, at Hardinge's expense, to procure two machinists to work on the scrapers. Hardinge said that it would send its field engineer to supervise the work, and it did so. Mitchell obtained the services of the appellant, Roland, and another machinist, through Ray V. Watson Company. The two machinists were usually employed by F. A. Lazenby Company, an affiliate of the Watson Company. Mitchell paid the Watson Company, as agent for Lazenby, for the machinists'

pay, and Hardinge reimbursed Mitchell therefor. While they were working under the direction of Edwin Bupp, a supervising engineer employed by Hardinge, and were engaged in correcting the malfunctioning of the machinery, an explosion occurred which injured the appellant. He received compensation for these injuries under the Workmen's Compensation Act from the insurance carrier for F. A. Lazenby Company.

The exact nature of the work which Hardinge undertook and which Roland was engaged in when injured is not shown by the appellant's statement of facts or by the appellee's few additions thereto or by the printed record extract. Roland's deposition, which was one of the items relied upon by Mitchell in support of its motion, shows that a part of the equipment furnished by Hardinge was a traveling crane, which was supposed to run back and forth along a track, moving the scrapers as it did so. The trouble was that the wheels of the crane were toed in. Consequently, they would not run true and the crane would not operate satisfactorily. Roland was employed in seeking to correct this condition.

The learned trial judge filed a short memorandum in which he did not undertake to "review the facts of the case or dwell on the voluminous record" before him. He stated briefly the reasons for his decision to grant Mitchell's motion for summary judgment. These (stated in even more condensed form) were that he found it to be undisputed: (a) that Mitchell was obligated under its contract with Esso to install the flight scrapers in a workmanlike manner, that repairing them was, therefore, a part of Mitchell's contract with Esso; (b) that the repair work was performed by Hardinge as part of its original "subcontract" from Mitchell and that Hardinge undertook this repair work promptly "under its guarantee to Mitchell" after being advised of the defect in the scrapers' performance; and (c) that at the time of being injured, Roland was working for Hardinge on the repair of the scrapers in order to get them to function properly. He then held that Mitchell was a statutory employer of Roland under § 62 of the Workmen's Compensation Act, *supra*.

It will be noted from the above that the trial court concluded that the work was repair work and that Hardinge

performed it as a part of its original "subcontract." Are these conclusions well founded? Unfortunately, the trial court has not spelled out the bases upon which they were reached.

We find it difficult to accept as an undisputed fact the conclusion that the corrective work which Hardinge was doing should be regarded as repair work. We observe that none of the affidavits so describes it. The defect may well have been due to faulty construction, indeed, this seems to us to be a probable explanation. There is nothing to suggest that the crane broke down after having been installed and that it therefore needed "repairs" in the very common sense of replacing a worn or worn out part. Nor do we see anything to suggest faulty installation on Mitchell's part; and even if there had been, it is still more difficult to see why Hardinge should have undertaken, at its own expense, to correct it. Correction in place and after installation of an original defect in construction might well have been agreed upon as a substitute for Hardinge's obligation to replace a defective part at Hardinge's factory. Certainly this would not have imported into the original contract a provision for such correction. The parties might have agreed upon a variation of the original contract. *Furness, Withy & Co. v. Randall,* 124 Md. 101, 91 A. 797; *Freeman v. Stanbern Construction Co.,* 205 Md. 71, 106 A. 2d 50; *Gallagher's Estate v. Battle,* 209 Md. 592, 604, 122 A. 2d 93 (rule recognized but not found applicable); *National School Studios, Inc. v. Mealey,* 211 Md. 116, 126 A. 2d 588.

The vital question as we see it is whether or not the agreement under which Hardinge undertook to put the crane in proper shape called for Hardinge's doing for Mitchell installation work which Mitchell was bound to do for Esso. It would make little difference whether such an obligation, if it came into existence at all, arose under the terms of the original agreement, under the terms of a substitutional agreement or modification of the original agreement, or under a wholly new agreement. We find no suggestion that there was a wholly new agreement.

The affidavits announce conclusions that Hardinge was obligated to do the work in question. One (that of Mr. Bupp,

an engineer employed by Hardinge) says that Hardinge guaranteed that the equipment would properly function. Another (the second affidavit of Mr. Wilhelm, Projects Manager for Mitchell) was to the effect that Hardinge was obligated under a business practice understood by Hardinge and Mitchell to do whatever was necessary to make the equipment operate properly after it was installed. This was said to be in addition to what the contract expressly provided. Neither conclusion is in accord with the terms of the contract as we read them, nor are the terms of any agreement for substituted performance shown.

There is no doubt that it was a part of Mitchell's obligation to Esso to install the scrapers in such a way that they would operate satisfactorily and that this was a part of Mitchell's business. There is also no doubt that the actual work which Hardinge undertook and in which Roland was engaged was necessary to make the equipment operate properly. It is also true, on the other hand, that the contract between Hardinge and Mitchell is, on its face, a contract for the sale of equipment by Hardinge to Mitchell and that it contemplated the installation thereof by Mitchell, and not by Hardinge. If the full extent of Hardinge's obligation was simply to deliver to Mitchell the flight scrapers in good working order, the case would, we think, fall within the holding in *Ryan v. Bethlehem Sparrows Point Shipyard, Inc., supra.* See also the discussion of this kind of situation in *State, Use of Reynolds v. City of Baltimore, supra,* 199 Md. 295-296. See also *Hooks v. Wayne County Road Commissioners,* 76 N. W. 2d 9 (Mich.); *Eley v. Benedict,* 46 N. E. 2d 492 (App. Ct. Ind.); *Heider v. Stoughton,* 35 N. W. 2d 814 (Neb.); and 99 C.J.S., *Workmen's Compensation,* § 107 e. It is, of course, possible that under some agreement, whether the original one or a subsequent one, Hardinge's contractual obligation went further and also required Hardinge to perform services for Mitchell in connection with the installation of the equipment in proper working order, which Mitchell was obligated to perform for Esso. If so, the case would, we think, be controlled by *State, Use of Reynolds v. City of Baltimore, supra.* See also *Holt & Bugbee Co. v. City of Melrose,* 311 Mass.

424, 426, 41 N. E. 2d 562, where it is said: "A subcontractor is 'one who has entered into a contract, express or implied, for the performance of an act, with a person who has already contracted for its performance.'" See also Radin's Law Dictionary, where "Sub-contract" is defined as "A contract with a person who owes labor or services under another contract, to perform some or all of the services or labor due." Cf. *M. A. Long Co. v. State Accident Fund, supra,* where it was held that a general contractor for the erection of a building could not be a principal contractor with relation to an electrical contractor where the general contractor's contract excluded the electrical work.

At this point it may be well to mention one provision of Section 62 of the Workmen's Compensation Act which has not been previously referred to. This is the clause providing that the kind of work covered by a subcontract with regard to which a principal contractor becomes a statutory employer of a workman employed by a subcontractor shall be "work which is a part of his [the principal contractor's] trade, business or occupation * * *." This clause seems to reflect the general purpose of the whole Section—to assure the protection to workers which the Act was intended to afford—by forestalling evasion of the Act by any employers who might seek to avoid its obligations by subdividing their operations through subcontracts. See 1 Larson, *Workmen's Compensation Law,* § 49.12 (1952). The printed record before us is not wholly clear as to whether or not the work here in question was a part of the trade, business or occupation of Mitchell; but no contention that it was not has been advanced by the appellant on this appeal, and for that reason we have not gone into this matter.

On the record submitted to us for consideration, we cannot determine with assurance whether Hardinge's contract, original or substituted, went beyond a contract of sale and became a subcontract. An inference might be drawn either way. Under *White v. Friel, supra,* a summary judgment, therefore, could not properly be entered.

Accordingly, the summary judgment in favor of Mitchell

20

must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

> *Judgment in favor of the appellee, Lloyd E. Mitchell, Inc., reversed and case remanded for further proceedings not inconsistent with this opinion; the costs of this appeal to be paid by the appellee.*