936 A.2d 343

**Kathleen HILL**

` v.

**CROSS COUNTRY SETTLEMENTS, LLC.**

**No. 4, Sept. Term, 2007.**

Court of Appeals of Maryland.

Dec. 3, 2007.

284

Leslie John Williams (Alan A. Abramowitz and Christina Bolmarcich of Bouland & Brush, LLC of Baltimore), on brief, for respondent.

Jeffrey L. Forman (Bruce E. Kauffman of Kauffman and Forman, P.A. of Towson), on brief, for petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (Retired, specially assigned) ALAN M. WILNER, (Retired, specially assigned), and DALE R. CATHELL, (Retired, specially assigned) JJ.

HARRELL, J.

The only thing that is crystal clear about this case is that the grant of summary judgment, on this record, was inappropriate. Although we cannot state conclusively that no conceivable set of facts that may be developed on remand, based on the analysis here, could support disposition of this dispute by summary judgment, we suggest that it is quite likely that this litigation presents triable issues.

## I.

Mary Sasso acquired the residential property at 533 S. Chester Street in Baltimore City (the "Property") on 28 March 1991. Approximately six months later, she conveyed the Property to her daughter, Kathleen Hill, reserving for herself, however, a life estate with the power to encumber the Property. In 1999, Sasso obtained a home equity loan from Provident Bank ("Provident") using the Property as security for the loan. Provident recorded among the land records of Baltimore City on 22 April 1999 the Deed of Trust associated with that loan. Sasso refinanced the loan with Provident, and a new Deed of Trust was executed, on 25 October 2002. Provident issued a certificate of satisfaction for the 1999 loan and properly recorded the new Deed of Trust.

Sasso died on 18 May 2003. Provident continued to receive from Hill regular payments on the 2002 loan until a last payment on 25 June 2004. In June 2004, Adedayo Mseka (the "Buyer") agreed with Hill to purchase the Property for $175,000. Cross Country Settlements, LLC ("Cross Country"), was engaged by the Buyer to conduct the closing. During its title search, Cross Country discovered the outstanding 2002 Deed of Trust in favor of Provident. Cross Country contacted Provident to obtain payoff information. At

this point in time, the only relevant information Cross Country had was the name of the borrower (Sasso) and other self-explanatory information revealed by the four corners of the recorded Deed of Trust. The record does not contain written documentation of the initial communications between Provident and Cross Country. The communications were characterized, however, in an affidavit of Cross Country's President, Rebecca L. Raras, submitted in support of Cross Country's motion for summary judgment, as "difficult." In essence, Cross Country was unable to obtain payoff information from Provident.

At some point after Cross Country contacted Provident initially, with no success, Cross Country asked for further information from Hill about the 2002 Deed of Trust loan. Hill gave Cross Country what she thought was the correct account number at Provident, number 96021899. This account number, as it turns out, was for the original 1999 loan on the Property, not the 2002 loan. Hill also supplied to Cross Country Sasso's death certificate, which contained such information as Sasso's Social Security Number.[1]

Cross Country, using the account number provided by Hill, contacted Provident again in an effort to obtain payoff information for the 2002 loan. Provident responded on 6 July 2004 with a letter stating "the above referenced loan was paid in full on October 30, 2002. Deed and Certificate of Satisfaction sent to customer on January 24, 2003." Cross Country nonetheless deemed it odd that a loan would be paid in full only five days after it had been executed and recorded. Cross Country renewed its request to Provident for payoff information for the 2002 loan. Provident responded by faxing a copy

---

1. Apparently unrecognized by the participants, a link to the answer to the mystery of the ostensibly unreleased 2002 Deed of Trust and loan was hidden in plain sight. In the bottom right corner of the 2002 Deed of Trust appears the super-imposed number 96038807, which, as hindsight reveals, was the correct account number at Provident for the 2002 loan. This is but one of several critical junctures in a parade of miscues where the legal morass that this case became might have been averted.

of the 6 July 2004 letter to Cross Country, with a cover sheet that said, "[t]his was faxed to you on 7–6–04. PS Loan has been pd in full." There is nothing in the record to indicate that Cross Country solicited a confirmatory release or certificate of satisfaction from Provident regarding the 2002 loan.

The Hill–Mseka closing on the Property occurred on 15 July 2004. At settlement, Raras claimed, in her summary judgment affidavit, that Hill inquired about a Provident account being paid off. Raras showed Hill the 6 July 2004 payoff letter from Provident and inquired as to whether there were outstanding mortgages on the Property. Hill responded that the Provident account she had in mind when earlier she supplied the number 96021899 was a credit card account in her mother's name. Raras also claims that Hill informed her that the payoff letter from Provident was accurate. The form "Owner's Affidavit" signed by Hill at closing states, "THAT no agreement or contract for conveyance, or deed, conveyance, written lease, or writing whatsoever, is in existence, adversely affecting the title to said premises, except that in connection with which this Affidavit is given." [2] The settlement proceeded, with Hill receiving the proceeds of the sale of the Property without deduction for any amount due on the 2002 Provident loan. Cross Country, as agent for Stewart Title Guaranty Company ("Stewart"), issued a title insurance policy to the Buyer.[3]

On 16 September 2004, two months after the closing and the last payment on the 2002 loan, Provident faxed Cross Country a pay off sheet for the outstanding loan, account number 96038807. The amount of the payoff was $70,261.26. On 21 September 2004, Cross Country sent a letter to Hill demand-

---

2. Later, when the litigation that is the present case was before the Circuit Court for Baltimore County, the Circuit Court, in dismissing certain counts in the Fourth Amended Complaint, stated, "one fact is clear; it is the opinion of this Court that [Hill] did not intentionally utter a false representation with the intent to deceive or defraud [Cross Country]."

3. No copy of this policy or any of its terms were made a part of the record.

ing that Hill "forward to Cross Country Settlements, LLC a certified check [for $70,261.26] made payable to Provident Bank...." Hill did not respond to the demand letter. On 22 December 2004, Provident informed the Buyer that the Property would be sold at foreclosure in early 2005. Provident initiated foreclosure proceedings in the Circuit Court for Baltimore City. The Buyer made a claim against her title insurer, Stewart. Stewart paid the $70,261.26 to Provident, without apparent protest or mounting a defense to the foreclosure on behalf of the Buyer, its insured. Because the title insurance policy was not made a part of the record here, there is no basis upon which to evaluate Stewart's decision to pay.

Stewart then made demand upon its issuing agent, Cross Country, for reimbursement of the funds paid to Provident. Cross Country paid Stewart on 18 February 2005. Cross Country claims it was required to reimburse Stewart by the terms of an underwriting agreement between them, although that agreement also was not made part of the record. The sole basis in the record in support of Cross Country's claim that it was obligated by contract to reimburse Stewart is a bare assertion to that effect in the affidavit of Raras.

Cross Country filed its first Complaint against Hill on 12 November 2004 in the Circuit Court for Baltimore County.[4] After a series of dismissals and amended complaints, the Fourth Amended Complaint (the final complaint) and Cross Country's motion for partial summary judgment were filed on 8 March 2005, after Cross Country paid Stewart.

The Fourth Amended Complaint contained five counts: intentional misrepresentation, intentional misrepresentation—concealment, negligent misrepresentation, unjust enrichment, and monies had and received. The misrepresentation counts were dismissed by the Circuit Court on Hill's motion on 5 October 2005.[5] Upon the parties' cross-motions for summary

---

4. Hill, the defendant, was a resident of Baltimore County at the time.

5. Hill filed a motion to dismiss all counts. The motion was granted only as to the three misrepresentation counts. The motion was denied

judgment,[6] the Circuit Court granted summary judgment to Cross Country on Count IV, unjust enrichment, on 2 December 2005.[7] Hill filed a timely appeal to the Court of Special Appeals. The intermediate appellate court, in a reported opinion, affirmed the judgment of the trial court. *Hill v. Cross Country Settlements, LLC,* 172 Md.App. 350, 914 A.2d 231 (2007). We granted certiorari, on Hill's petition, to consider whether the trial court was correct in granting summary judgment to Cross Country. *Hill v. Cross Country Settlements,* 398 Md. 314, 920 A.2d 1058 (2007).[8]

---

as to the remaining two claims, unjust enrichment and monies had and received. The Circuit Court's Memorandum Opinion and Ruling, dated 5 October 2005, purported to hold that "[Cross Country] is entitled to restitutionary relief including [Cross Country's] fifth claim of Monies Had and Received." Such a ruling was improper in disposition of a motion to dismiss, and is entitled to no legal force or effect.

6. Cross Country supported its motion for summary judgment with Raras's affidavit. Hill filed no affidavit, either in support of its counter-motion or in opposition to Raras's affidavit.

7. Cross Country moved for summary judgment only on the unjust enrichment claim. Thus, it is the only claim at issue before this Court.

8. Hill's Petition for Writ of Certiorari presented three questions for our consideration:

I. Where, in response to a payoff request, a lender issues two written payoff statements to a settlement company, which unequivocally state that there is no balance due under a mortgage, and the settlement company, acting in reliance upon those representations, disburses the net settlement funds to the seller, is that lender estopped from later foreclosing against the property to recover the amount which it subsequently contends it discovered was due under the mortgage?

II. Where the lender described above forecloses against the property to collect the amount it claims to have erroneously left out of the payoff statements, and the buyer makes a claim against the title insurer, if the title insurer merely pays the lender instead of defending on the basis of estoppel, is the settlement company liable to indemnify the title insurer?

III. Where the settlement company described above merely reimburses the title insurer instead of defending on the basis that it did not commit any error in conducting the settlement, may the settlement company bring an unjust enrichment action against the seller of the house for reimbursement of the amount which the settlement company paid to the title insurer?

## II.

 Maryland law is well settled regarding the appellate standards to be applied in reviewing a grant of summary judgment. Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the party in whose favor judgment is entered is entitled to judgment as a matter of law." Maryland Rule 2–501(f). "In granting or denying a motion for summary judgment, a judge makes no findings of fact." *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608, 615 (1985). The appellate court will "review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006). "In reviewing a grant of summary judgment under Md. Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 714, 922 A.2d 538, 543 (2007) (quoting *Livesay v. Baltimore County*, 384 Md. 1, 9–10, 862 A.2d 33, 38 (2004)).

 As iterated above, if there is a genuine dispute as to any material fact, summary judgment is improper. Even where the underlying facts are undisputed, "if they [are] susceptible of more than one inference, the party against whom inferences [are] to be drawn ... [is] entitled to the inferences most favorable to his contentions." *Roland v. Lloyd E. Mitchell, Inc.*, 221 Md. 11, 14, 155 A.2d 691, 693 (1959) (citing *White v. Friel*, 210 Md. 274, 285, 123 A.2d 303, 308 (1956)). If the facts are subject to more than one inference, those inferences should be submitted to the trier of fact. *Porter v. Gen. Boiler Casing Co.*, 284 Md. 402, 413, 396 A.2d 1090, 1096 (1979); *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256, 258(1970).

## III.

 In 2000, this Court identified the elements of a claim of

unjust enrichment,[9] previously considered by the Court of Special Appeals in *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28, 31 (1980). Unjust enrichment consists of three elements:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Berry & Gould, P.A. v. Berry,* 360 Md. 142, 151–152, 757 A.2d 108, 113 (2000) (quoting *County Comm'rs v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000)).

Unjust enrichment is a claim, however, that may not be reduced neatly to a golden rule. *See* Daniel Friedmann, *Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong,* 80 COLUM. L.REV. 504, 504–05 (1980) ("[U]njust enrichment is notoriously difficult to define. It has on occasion been regarded as too indefinite and vague to be recognized as a general legal principle, with concern expressed that its adoption might undermine legal stability, confuse legal thinking, and jeopardize clear, systematic organization of the law."). A successful unjust enrichment claim serves to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite

---

**9.** Because of chaotic and disjointed development in this area, the body of law of unjust enrichment, restitution, subrogation, and related causes and remedies is both voluminous and disorganized. *See* DANIEL B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 4.1 n. 18 (1973):

It is said that sooner or later, monkeys in the British Museum, typing at random, will by sheer chance reproduce exactly all the works of Shakespeare, and that somewhere in Tibet monks are diligently compiling the billions of names for God. There is no similar legend that restitution materials will eventually appear under every conceivable digest topic and word index entry, but there should be.

honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Dep't of Hous. & Cmty. Dev. v. Mullen,* 165 Md.App. 624, 659, 886 A.2d 900, 921 (2005), *cert. denied,* 391 Md. 579, 894 A.2d 546 (2006) (quoting DOBBS, *supra,* § 4.1). "A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould, P.A. v. Berry,* 360 Md. 142, 151, 757 A.2d 108, 113 (2000) (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983)). "The restitution claim . . . is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep." *Mass Transit Admin. v. Granite Const. Co.,* 57 Md.App. 766, 775, 471 A.2d 1121, 1126 (1984). "The defendant who has received money from the plaintiff by mistake, even though the mistake is an honest one, may be compelled to make restitution of the money." DOBBS, *supra,* § 4.1.

 A defendant, however, "is not unjustly enriched, and therefore not required to make restitution where the benefit was conferred by a volunteer or intermeddler." DOBBS, *supra,* § 4.9 (citing Restatement (First) of Restitution § 112 (1937)). This principle is based on the notion that "one who confers a benefit upon another without affording that other the opportunity to reject the benefit, has no equitable claim for relief against the recipient of the benefit in the absence of some special policy. . . ." DOBBS, *supra,* § 4.9.

"If plaintiff pays defendant's debt under the mistaken apprehension that he was himself under a duty to do it . . . there is less reason to treat him as being officious, and the courts will usually grant restitution." John W. Wade, *Restitution for Benefits Conferred Without Request,* 19 VAND. L.REV. 1183, 1201 (1996); *see Boney v. Cent. Mut. Ins. Co. of Chi.,* 213 N.C. 563, 197 S.E. 122 (1938) (holding that plaintiff insurance broker is entitled to recovery from defendant insurance carrier where the plaintiff paid claim denied by carrier out of moral responsibility); *but see Gallagher, Magner & Solomento, Inc. v. Aetna Cas. & Sur. Co.,* 214 Pa.Super. 233, 252 A.2d 206, 207

(1969) (denying recovery where plaintiff insurance broker paid claim denied by insurance carrier because "where the plaintiff is not liable for the debt, he has no right to volunteer a payment"); *Gaul v. McLaughlin,* 207 Pa.Super. 434, 217 A.2d 757 (1966).

An unjust enrichment claim is "equitable in nature, and the right to restitution is therefore subject to any counter-equities that the recipient of benefits may assert." DOBBS, *supra,* § 11.9. Although the basis for recovery in unjust enrichment is not based on fault, misconduct or fault of one of the parties is sometimes considered in determining whether to permit recovery. DOBBS, *supra,* § 11.9.[10]

### III.

The parties to the present case vigorously contest the application of the elements of unjust enrichment to the record. Hill argues that, as a matter of law, none of the required elements, especially the second element, can be satisfied, and therefore summary judgment was inappropriate. Cross Country contends that all three elements have been satisfied, and demands affirmance of the trial court's judgment.

### A.

Regarding the first element, whether the plaintiff conferred a cognizable benefit on the defendant, Hill argues

---

**10.** Dobbs identifies four distinct and independent considerations that may balance the equities in favor of the recipient of un-earned benefits:

(1) that the recipient of the benefit has in fact gained no net benefit from the transaction, because, without fault, he has fairly passed the benefit to others;

(2) that the recipient of the benefit has changed his position in reliance upon the benefit in some way, so that restoration would work a hardship on him;

(3) that some broad social policy, as distinguished from equities and hardships, is opposed to restitution;

(4) that the recipient of the benefit may not have changed position, but for reasons of convenience in judicial administration, or for reasons of transactional stability, courts will not re-open the transaction.

DOBBS, *supra,* § 11.9.

that Cross Country was not capable of bestowing a benefit, as it did not pay over to Hill monies belonging to Cross Country. As a settlement agent, Hill contends, Cross Country had no financial stake in the closing transaction, other than its own fees. Cross Country's role in the transaction essentially was to act as an intermediary and conduit for monies belonging to others. Cross Country counters by pointing out that a representative of Cross Country at the closing handed Hill a check drawn on a Cross Country checking account. Cross Country contends that there is no doubt that Hill received a benefit from Cross Country.

Both parties largely are incorrect. Although the consummation of the real estate closing did not constitute a conveyance of a benefit to Hill by Cross Country for the purposes of analysis of an unjust enrichment claim, the events alleged to have occurred subsequent to the closing may support a conclusion that a benefit was conferred. As a matter of law, the payment of the debt of another constitutes a benefit conferred, and thus may satisfy the first element of an unjust enrichment claim. THE RESTATEMENT (FIRST) OF RESTITUTION § 76 (1937) states, "[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct." Thus, when a plaintiff pays the liability of the defendant, the defendant's balance sheet improves as a result of such payment. *See* Wade, *supra*, at 1186 ("One is enriched not only when he receives an asset but also when someone else performs for him a duty which would be a burden to him. The clearest case is that of one person paying another's debt. The elimination of this obligation is clearly a benefit. . . ."). Moreover, we have not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiffs own resources. *See Plitt v. Greenberg,* 242 Md. 359, 364, 219 A.2d 237, 241 (1966) (" 'It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third

person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner.'" (quoting *Empire Oil Co. v. Lynch,* 106 Ga.App. 42, 126 S.E.2d 478, 479 (1963))); *Plitt,* 242 Md. at 364, 219 A.2d at 241 ("[A] plaintiff could recover money from even an innocent transferee who was without knowledge that he possessed the plaintiff's money.").

Cross Country, by reimbursing Stewart, paid an asserted debt which it contends is more properly chargeable to Hill. If Hill were found to be liable to Stewart, and as a result of the payment by Cross Country that liability was erased, Hill may be said to have received a benefit from satisfaction of that claim. By contrast, if Hill should be determined not to be liable to Provident or Stewart in an action brought directly against Hill, Hill received no benefit as Cross Country paid a debt that Hill did not owe.

## B.

Hill contends that the second element of an unjust enrichment claim is not present because, viewing the well-pleaded facts in the light most favorable to her as the nonmoving party, she was unaware of the 2002 mortgage at the time she received the overpayment at closing. This argument fails to for two reasons.

First, as discussed above, the alleged benefit being litigated in this case is Cross Country's reimbursement to Stewart. The essence of the requirement that the defendant have knowledge or appreciation of the benefit is that the defendant have an opportunity to decline the benefit. "It is quite appropriate to say ... that the opportunity may exist later; and that the defendant has a true opportunity to decline by insisting that he pay the debt himself. This would produce a ... result ... which should be encouraged." Wade, *supra,* at 1213. Hill apparently had knowledge and appreciation of that payment, as she received a written demand from Cross Country that she pay the balance owed on the mortgage to Provident. In fact, this litigation was initiated prior to the payment

from Cross Country to Stewart. Hill had a fair opportunity to decline the alleged benefit ultimately conferred by Cross Country by making the payment herself.[11]

Second, Hill misunderstands the purpose behind the requirement that the defendant against whom a successful unjust enrichment claim is lodged have knowledge or appreciation of the benefit conferred. When the benefit conferred is money, there is no requirement that a defendant necessarily have knowledge or appreciation of the benefit precisely at the time the benefit is conferred.[12] Some courts have held that when a defendant declines a plaintiff's request to return a conferred benefit, the defendant has been afforded a fair opportunity to reject the benefit, and thus, recovery may be permitted. *See Consol. Fisheries Co. v. Consol. Solubles Co.,* 112 A.2d 30, 35 (Del.1955) ("As a general rule, also, even a volunteer who pays the obligation of another is entitled to reimbursement from the obligor when he takes advantage of the act of the volunteer."); *Beacon Homes, Inc. v. Holt,* 266 N.C. 467, 146 S.E.2d 434 (N.C.1966) (holding that when plaintiff erroneously built a house on defendant's land, and defen-

---

**11.** We express no view as to what a trier of fact might make of the asserted fact, if admitted in evidence, that Hill allegedly submitted to Provident the monthly payments due on the 2002 loan for 12 consecutive months following Sasso's death.

**12.** The purpose behind this requirement is to prevent a true officious intermeddler from maintaining an action for unjust enrichment or quantum meruit when the intermeddler claims he should be compensated for services rendered or value provided to the defendant. Dobbs provides an apt example. While the homeowner is away, a house painter paints the entire house, without the owner's consent, thereby adding value to the homeowner's property. The added value of the home cannot be separated easily and returned to the house painter. Therefore, a court should not permit the house painter to recover. Dobbs notes that, although the homeowner is enriched, this result "is preferable to payment of the intermeddler, who should not thus be encouraged to invade another's freedom of choice about his own affairs." Dobbs, *supra,* § 4.9. If, however, the benefit is something that can be easily returned, such as money or personal property, "the fact that it is retained and used is a choice. When this choice is available, the choice principle is satisfied and restitution ... ought to be required." Dobbs, *supra,* § 4.9.

dant refused to permit plaintiff to remove the structure, plaintiff was entitled to recovery because defendant had a choice of retaining the benefit). In other words, restitutionary recovery may be permitted under a theory of unjust enrichment when the recipient of the benefit "in fact retains a choice of keeping or returning it...." DOBBS, *supra*, § 4.9. If a plaintiff is mistaken as to the duties or rights that he or she owes another and "because of his mistake confers a benefit upon another, that [plaintiff] is often entitled to recover the value of that benefit, in spite of the fact that the recipient was given no opportunity to decline it." DOBBS, *supra*, § 4.9.

## C.

■■■ The final element of an unjust enrichment claim is a fact-specific balancing of the equities. "The task is to determine whether the enrichment is unjust." Wade, *supra*, at 1185. In making fact-specific determinations, a reviewing court considers the facts in the record, and the reasonable inferences drawn from those facts, in a light most favorable to the non-moving party, Hill in this case. *Harford County v. Saks*, 399 Md. 73, 82, 923 A.2d 1, 6, (2007). Hill presents two related arguments. First, Hill argues that, because either Cross Country or Stewart could have avoided enforcement of any asserted liability owed to Provident by asserting the doctrine of equitable estoppel, Cross Country was a volunteer and therefore prohibited from recovery against her. Second, Hill argues that an unjust enrichment claim should not be allowed to be maintained in lieu of a subrogation claim which, if anything, was the more proper form of remedy, if any remedy existed. Under subrogation, Hill contends, she would be able to assert the defense of equitable estoppel against Cross Country and defeat recovery. We will address each of these arguments in turn.

## 1.

■■ It is undisputed that once properly yoked with the label of "mere volunteer" or "officious payor," a plaintiff is prohibited from recovering under theories of unjust enrich-

ment or subrogation. It less clear, however, precisely when a plaintiff's payment to a third party satisfying the liability of the defendant renders a plaintiff a volunteer and casts him or her "into legal outer darkness." DOBBS, *supra*, § 4.3. Palmer notes that "[w]hen one person, without request, knowingly pays the debt of another ... restitution will normally be denied." GEORGE E. PALMER, THE LAW OF RESTITUTION § 10.2 (1978).

In ancient Roman law, volunteering to interfere and manage the business of another was encouraged and rewarded. Edward W. Hope, *Officiousness*, 15 CORNELL L.Q. 25, 25 (1929). In the course of the development of the English common law, however, a prohibition on the recovery of volunteers became accepted. "With considerable truth, it has been said whenever the courts for some reason see fit to refuse subrogation, they denote the unsuccessful plaintiff a 'volunteer.' It maybe pointed out also that even where subrogation is allowed, the courts almost invariably pay lip service to the rule." Note, *Subrogation and the Volunteer Rule*, 24 VA. L.REV. 771, 772 (1938). Although older surveyed cases strictly and harshly applied the volunteer rule, more recent cases map a trend to a "liberal attitude toward those who pay the debt of another, taking the form of a pronounced reluctance to designate the claimant a 'volunteer.'" Note, *supra*, at 774; *See* Daniel Friedmann, *Unjust Enrichment, Pursuance of Self–Interest, and the Limits of Free Riding*, 36 LOY. L.A.L.REV. 831, 854 (2003) ("The modern approach in American law is more liberal and tends to relax the traditional rule and allow the payor, who has an interest in discharging the debt or a moral duty to do so, to recover from the real debtors.")

The drafters of the Restatement (First) of Restitution avoided the difficulty associated with defining the circumstances by which one becomes a "volunteer" prohibited from recovery in unjust enrichment largely by ignoring the term altogether. *See* Restatement (First) of Restitution § 162 cmt. b (1937) ("Where a person discharges an obligation owed by another, or a lien upon the property of another, and does so officiously, he is not entitled to reimbursement from the other

... and is not entitled to be subrogated to the position of the obligee or lien-holder.... On the other hand, where the plaintiff is not officious, and he uses his property or his property is used in discharging the obligation of another or a lien upon another's property, he is entitled to reimbursement and is entitled to the remedy of subrogation to obtain reimbursement."). The Restatement's definition of "officiousness" is no more helpful to the present inquiry than its approach to "volunteer." *See* Restatement (First) of Restitution § 2 (1937) cmt. a ("Officiousness means interference in the affairs of others not justified by the circumstances under which the interference takes place.").[13]

The legal principles regarding subrogation contain a parallel prohibition against volunteers from recovering.

Although it is difficult to lay down a general rule applicable to all cases in which subrogation is sought, the essential elements necessary for legal subrogation (as distinguished from conventional and statutory subrogation) are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, *who is neither a volunteer nor an intermeddler*, pays or discharges in order to protect his own rights and interests, (emphasis added)

*George L. Schnader, Jr., Inc. v. Cole Bldg. Co.*, 236 Md. 17, 23, 202 A.2d 326, 330 (1964) (citing James Morfit Mullen, *The Equitable Doctrine of Subrogation*, 3 MD. L.REV. 201, 203 (1939)).

The foregoing descriptions of how subrogation and unjust enrichment should operate are helpful, but lacking in a significant respect, as applied to the present case, because of the vaguely defined terms "volunteer" and "intermeddler." The issues become more complex in cases such as this, where it is asserted that a "plaintiff settled and paid a ... claim asserted by a third party on which the defendant was solely liable."

---

**13.** For the purposes of this opinion, we deem "officious payor," "intermeddler," and "volunteer" as having identical meanings.

PALMER, *supra*, § 22.2.[14] In *McNiece v. Eliason*, 78 Md. 168, 27 A. 940 (1894), an unsecured creditor of an estate sought to pay an overdue mortgage on property owned by the estate and thereby become subrogated to the rights of a mortgagor. The Court held that the general creditor had no such right and would be a mere volunteer. In *Robertson v. Mowell*, 66 Md. 530, 8 A. 273 (1887), we enforced a plaintiffs subrogation rights when she paid her brother's mortgage with the understanding that she was to be subrogated. In holding that she was not a volunteer, we noted:

> It is true she was under no legal obligation to make this payment, but, under the circumstances stated, she cannot be regarded as a mere stranger or volunteer, officiously intermeddling with a matter which in no way concerned her. There are no intervening incumbrances or rights of creditors to be interfered with, nor any superior or equal equities to be displaced.

*Robertson*, 66 Md. at 538, 8 A. at 277.

In *Springham v. Kordek*, 55 Md.App. 449, 462 A.2d 567 (1983), children made payments on their mother's mortgage after her spouse abandoned her. The Court of Special Appeals held that, although the children acted without legal compulsion, they were not prohibited from recovery on the bases that: (1) they had a moral obligation to assist their mother; (2) they were protecting their own property interest; and, (3) they acted at the request of their mother.

 Absolute legal compulsion is not required in order for a plaintiff to avoid the fatal designation of "officious." *See* Restatement (First) of Restitution (1937) § 79. ("A person . . . who was claimed by the creditor to be an obligor, upon an

---

**14.** Palmer describes the two problems that arise when a plaintiff settles a claim brought by a third party where the defendant solely was liable for the claim. PALMER, *supra*, § 22.2 The first question is whether the circumstances take the plaintiff out of the "volunteer category." PALMER, *supra*, § 22.2. The second is whether the plaintiff may recover the entire amount that the plaintiff paid to settle the claim. PALMER, *supra*, § 22.2. Because there is no dispute as to the amount of the underlying claim, we need not consider further the latter scenario.

obligation which, as between such person and another, the other had a primary duty to discharge, and who has paid the creditor in discharge of the obligation at a time when it existed against the other, is entitled to indemnity from the other, *although originally or at the time of payment, the payor was under no duty to make the payment,* unless his payment was officious.") (emphasis added); PALMER, *supra,* § 22.1 ("If one person mistakenly pays the debt of another, usually in the mistaken belief that it is his own debt, the policy against intervention of in the affairs of another loses its force . . . ."). The issue turns on whether the plaintiff made a "justified intervention in the defendant's affairs." PALMER, *supra,* § 22.2.

The factual novelty of the present case requires us to adopt a rule to guide future unjust enrichment and subrogation actions. We agree with the Restatement (First) of Restitution (1937) § 79, that a plaintiff may recover for a payment or payments to a third party as long as the plaintiff was not officious in making such payment or payments. Although we shall not supply an exhaustive list of situations where a plaintiff would not be deemed officious, generally a plaintiff is not officious when he or she acts under a legal compulsion or duty, acts under a legally cognizable moral duty, acts to protect his or her own property interests, acts at the request of the defendant, or acts pursuant to a reasonable or justifiable mistake as to any of the aforementioned categories.[15]

---

**15.** Public policy is best served by striving, where logical and fair to do so, to achieve consistency in the interpretation and application of the overlapping theories of subrogation and unjust enrichment. Consistent with that, we believe the definition of "volunteer" must be identical, regardless of the case, in dealing with unjust enrichment or subrogation. It makes little sense to enable a plaintiff to choose between such closely related legal theories and obtain different results. *Beall v. Beall,* 291 Md. 224, 234 n. 2, 434 A.2d 1015, 1021 n. 2 (1981) (interpreting the common law in such a way as to avoid "anomalous results").

Public policy also is best served by liberally permitting a plaintiff to be subrogated to the rights of a third-party creditor. In traditional insurance subrogation cases, a narrow definition of the volunteer rule serves to encourage insurers to defend their insured even where there is a dispute over liability or coverage, thus avoiding unnecessary delay in

Applying the considered rules regarding volunteers to the present case, Hill would be allowed to defend on the ground that Cross Country was an officious payor, if Cross Country had no legal or moral obligation to pay Stewart or that any mistake by Cross Country regarding its legal obligations was unreasonable and unjustified.

Cross Country implied in the Circuit Court that its payment to Stewart was not voluntary by asserting baldly that the payment was required pursuant to an underwriting agreement between them. Maryland Rule 2–501(a) requires that a motion for summary judgment be supported by an affidavit if it is "based upon facts not in the record." In its motion for partial summary judgment, Cross Country relied upon Raras's attached affidavit, which stated, "Stewart made demand upon Cross Country, in accordance with the terms of our underwriting agreement, for reimbursement of the funds it paid to Provident. On February 18, 2005, Cross Country paid Stewart the $76,402.94 incurred by it to avert the foreclosure." Raras's affidavit, by mere allusion to a document and without attaching that document or reciting its relevant terms, sought to imply a legal conclusion. In essence, Cross Country argues for the legal proposition that it was obligated contractually to pay Stewart, and thus, suffered financial loss.

Maryland Rule 2–501(c) requires that an affidavit supporting a motion for summary judgment "set forth such facts as would be admissible in evidence." The wholly legal conclusions, explicit and implicit, contained in Raras's affidavit regarding the asserted legal effect of the alleged underwriting agreement are neither facts nor would they be admissible in evidence, notwithstanding whether the document itself, had it been attached, would have been admissible. "The interpreta-

---

the settlement of claims. "[P]ayment is not voluntary if it is made with a reasonable or good faith belief in obligation or personal interest in making that payment." COUCH ON INSURANCE § 223:27 (3d ed.2005). "If plaintiff pays defendant's debt under the mistaken apprehension that he was himself under a duty to do it ... there is less reason to treat him as being officious, and the courts will usually grant restitution." Wade, *supra,* at 1201.

tion of a contract ... is a question of law...." *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC,* 376 Md. 157, 163, 829 A.2d 540, 544 (2003); *see Langston v. Langston,* 366 Md. 490, 506, 784 A.2d 1086, 1095 (2001), *abrogated on other grounds, Bienkowski v. Brooks,* 386 Md. 516, 873 A.2d 1122 (2005); *Wells v. Chevy Chase Bank,* 363 Md. 232, 250, 768 A.2d 620, 629–30 (2001); *Auction & Estate Reps. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 445 (1999); *Calomiris v. Woods,* 353 Md. 425, 434–35, 727 A.2d 358, 362–63 (1999). Maryland Rules 5–1002 and 5–1003 require that a party prove the content of a writing by entering into evidence the original document or a duplicate.[16]

Interpreting the predecessor to Maryland Rule 2–501,[17] we opined that

> "a person who claims the existence of a document which is material ... to a motion for summary judgment ... should explain in his affidavit why he cannot produce it.... He cannot merely allude to its existence, and without more, hope to raise the specter of dispute over a material fact which would defeat the motion for summary judgment...."

*Brown v. Suburban Cadillac, Inc.,* 260 Md. 251, 256–257, 272 A.2d 42, 45 (1971); *see also Hurt v. Stillman & Dolan, Inc.,* 35 Md.App. 644, 646, 371 A.2d 1137, 1138 (1977) ("An unsupported conclusion is not the proper way to show an issue of a material fact." (citing *Carter v. Baltimore Gas & Electric Co.,* 25 Md.App. 717, 724, 336 A.2d 790 (1975))).

There appears to us no good reason that the same standards should not apply to the affidavit in the instant case offered in support of a motion. If Cross Country desired to rely on the legal conclusion that the alleged underwriting agreement required it to indemnify Stewart, Cross Country

---

**16.** Maryland Rule 5–1004 permits a party to prove the contents of a writing by other evidence in four narrow situations. There is no indication here that any of these four unusual circumstances apply in this case.

**17.** Maryland Rule 610 (1957, 1971 Repl.Vol.).

was required to produce the underwriting agreement or, at a minimum, recite the relevant operative terms. Just as we do not permit the non-moving party to defend against summary judgment based on bald conclusions of law, a moving party may not rely on unsupported conclusory statements to justify the grant of summary judgment.

In *Wyand v. Patterson Agency, Inc.*, 266 Md. 456, 295 A.2d 773 (1972), we addressed the effectiveness of an affidavit in support of summary judgment consisting of a "bald assertion amounting to a naked legal conclusion" that the defendant was indebted to the plaintiff. We held that a "general allegation of a legal conclusion without detailed and precise facts to support it erects no foundation upon which a summary judgment can rest...." *Wyand,* 266 Md. at 461, 295 A.2d at 776; *see also Champion v. United Va. Bank,* 87 Md.App. 439, 441, 589 A.2d 1328, 1329 (1991) (holding that an affidavit filed in support of summary judgment pursuant to Maryland Rule 2–501(a) "must contain evidentiary facts, not conclusions, and it should be full, certain and exact"). Cross Country's asserted entitlement to summary judgment rests to a similar extent on such an unsupported legal conclusion regarding the interpretation and/or legal effect of the absent underwriting agreement with Stewart.[18] Therefore, summary judgment must be reversed for that reason alone.

---

**18.** The Fourth Circuit recently summarized the difficulties facing a court in interpreting a contract in summary judgment analysis:

A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on

 Even had Cross Country produced the underwriting agreement and its terms called for the reimbursement claimed, there could remain an issue regarding whether Cross Country successfully could maintain an argument that Stewart was a volunteer when it paid Provident to forestall the threatened foreclosure of Mseka's interest in the Property. It appears from the record that Stewart may have had available a defense of equitable estoppel against Provident's foreclosure action. We have defined equitable estoppel generally:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Cunninghame v. Cunninghame*, 364 Md. 266, 289, 772 A.2d 1188, 1201 (2001) (citing 3 J. POMEROY, EQUITY JURISPRUDENCE § 804 (5th ed.1941)).

 Mortgage foreclosure is an equitable remedy in Maryland. *Wells Fargo Home Mortgage, Inc. v. Neal,* 398 Md. 705, 728 922 A.2d 538, 551 (2007). It long has been held that "he who comes into equity must come with clean hands." *Thomas v. Klemm,* 185 Md. 136, 142, 43 A.2d 193, 197 (1945). "[C]ourts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he seeks assistance." *Hlista v. Altevogt,* 239 Md. 43, 48, 210 A.2d 153, 156 (1965); *see also Hicks v. Gilbert,* 135 Md.App. 394, 400, 762 A.2d 986, 989–90 (2000). "When the

---

that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact, (citations omitted). *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 235 (4th Cir.2007).

plaintiff asserts an equitable remedy, equitable defenses can be invoked even if they could not be invoked against a 'legal' claim." *Alternatives Unlimited, Inc. v. New Balt. City Bd. of School Comm'rs*, 155 Md.App. 415, 458–59, 843 A.2d 252, 278 (2004). Equitable estoppel, it seems, may be invoked as a defense to a foreclosure action, at least in concept. *See Schaller v. Castle Dev. Corp.*, 111 Md.App. 40, 45 680 A.2d 528, 530 (1996) (applying principles of equitable estoppel to foreclosure sale audit) *vacated on other grounds*, 347 Md. 90, 698 A.2d 1106 (1997); *cf. Wright v. Wagner*, 182 Md. 483, 490, 34 A.2d 441, 445 (1943) (applying equitable estoppel to prevent mortgagee from imposing liability on mortgagor instead of mortgagor's grantee); *E. End Loan & Savs. Ass'n of Balt. City v. Berman*, 170 Md. 536, 541, 185 A. 332, 333 (1936) (holding that equitable estoppel could prevent mortgagee from obtaining deficiency judgment against mortgagor); *Barasso v. Rear Still Hill Rd., LLC*, 81 Conn.App. 798, 842 A.2d 1134, 1139 (2004) (holding that equitable estoppel is a defense to a foreclosure action); *Stewart Title Guar. Co. v. F.D.I.C*, 936 S.W.2d 266, 269 (Tenn.Ct.App.) (1996) (holding that equitable estoppel prevented lender's successor from foreclosing).

Equitable estoppel essentially consists of three elements: "voluntary conduct or representation, reliance, and detriment." *Mona Elec. Co. v. Shelton*, 377 Md. 320, 334, 833 A.2d 527, 535–36 (2003) (citing *Creveling v. Gov't. Employees Ins. Co.*, 376 Md. 72, 102, 828 A.2d 229, 246 (2003)). Stewart, viewing the facts on this record in a light most favorable to Hill, may have had a colorable equitable estoppel argument, which, if interposed and successful, might have precluded Provident from obtaining foreclosure relief. As noted above, however, payment, absent legal liability, does not necessarily make a payor officious. The payor, in order to be deemed a volunteer, must have been unreasonable in its mistake regarding the legal obligation to pay. Thus, Hill could emerge victorious from the suit against her by Cross Country if Cross Country was not liable to Stewart (either because Stewart was a volunteer or because the underwriting agreement did not require Cross Country's indemnification of Stewart) and Cross

Country was unreasonably mistaken as to its legal liability to Stewart.

2.

Hill contends that the proper remedy, if any, befitting Cross Country's claim is an action in subrogation or indemnification, not for unjust enrichment. Hill's argument has two implications: that Hill should be entitled to assert equitable estoppel as a defense against Cross Country; and Stewart, by not asserting equitable estoppel against Provident, was a mere volunteer when it paid Provident.

 As a preliminary matter, we note that Cross Country appears to have pleaded the elements required for a legal subrogation claim, albeit without mentioning subrogation by name. A plaintiff does not need to mention specifically subrogation in order to obtain relief under the doctrine. *See Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 412, 559 A.2d 365, 368 (1989) ("We are here presented with another situation where a plaintiff has not specifically invoked the doctrine of subrogation, but, as in *Schnader and Maryland Title*, all of the elements of this doctrine have been pleaded and proved. [The plaintiff] is thus entitled to recover under the doctrine of subrogation." (citing *George L. Schnader, Inc. v. Cole Bldg. Co.*, 236 Md. 17, 202 A.2d 326 (1964); *Md. Title & Escrow Corp. v. Kosisky*, 245 Md. 13, 225 A.2d 47 (1966))).

 Maryland recognizes three distinct categories of subrogation: legal subrogation, conventional subrogation, and statutory subrogation. *Fin. Co. of Am. v. U.S. Fid. & Guar. Co.*, 277 Md. 177, 182, 353 A.2d 249, 252 (1976).[19] "Legal subrogation ... arises by operation of law when there is a

---

**19.** Only legal subrogation could be relevant in the present case. Conventional subrogation arises by the operation of an agreement between the parties. Statutory subrogation, naturally, arises pursuant to a statute. *Fin. Co. of Am. v. U.S. Fid. & Guar. Co.*, 277 Md. 177, 182, 353 A.2d 249, 252 (1976). In this case, only legal subrogation may apply because there is no relevant statute governing this situation or an agreement between Hill and Cross Country.

debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitle him to reimbursement to prevent unjust enrichment."[20] *Md. Title,* 245 Md. at 20, 225 A.2d at 50.

Subrogation and unjust enrichment are related legal theories and share many overlapping legal principles. We previously described the relationship between subrogation and unjust enrichment:

> " 'The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one, who, injustice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment ....' "

*Podgurski v. OneBeacon Ins. Co.,* 374 Md. 133, 141, 821 A.2d 400, 405 (2003) (quoting 10 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1265 (Walter. H.E. Jaeger 3d ed.1957)).

 Subrogation is " 'the substitution of one person to the position of another, an obligee, whose claim he has satisfied.... The basic principles underlying subrogation are the same as those in constructive trusts, prevention of merger, and equitable liens, i.e., restitution to prevent forfeiture and unjust enrichment.' " *G.E. Capital Mortgage Servs., Inc. v. Levenson,* 338 Md. 227, 231, 657 A.2d 1170, 1172 (1995)

---

20. The overlap between the theories of unjust enrichment and legal subrogation are obvious when comparing the elements of each. The first element of unjust enrichment requires that the plaintiff convey a benefit to the defendant. By contrast, legal subrogation requires that the plaintiff pay an existing debt of the defendant. In that respect, legal subrogation is a more specific description for unjust enrichment generally where the value received by the plaintiff is that his obligation to a creditor has been discharged by a third party.

Both legal theories prohibit a volunteer or officious payor from recovery. Both legal theories also conclude with a general "balancing of equities" test. Both legal theories seek to obtain a fair, equitable result. In fact, the only significant difference between the two is the singular requirement in unjust enrichment that the defendant have some knowledge or appreciation of the benefit conveyed to her or him.

(quoting G.E. Osborne, Handbook on The Law of Mortgages § 277 (2d ed.1970)). The substituted person " 'can exercise no right not possessed by his predecessor, and can only exercise such right under the same conditions and limitations as were binding on his predecessor.' " *George L. Schnader, Jr., Inc. v. Cole Bldg. Co.*, 236 Md. 17, 23, 202 A.2d 326, 330 (1964) (quoting *Poe v. Phil. Cas. Co.*, 118 Md. 347, 353, 84 A. 476, 478 (1912)). "Subrogation, like lien, trust, and contract, may arise by agreement of the parties. But subrogation is also a remedy invoked by courts . . . to prevent unjust enrichment, and for this purpose it is appropriate in any case where restitution is warranted and the remedy can be given without working injustice." Dobbs, *supra*, § 4.3.

Dobbs further elaborated:

Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert his rights. There are many ways this right may come ab out, but the pattern almost always looks something like this: A debtor owes money to a creditor. For some reason, perhaps due to mistake or fraud, the plaintiff pays the debtor's debt, thus satisfying the creditor's claim against the debtor. If there is no legitimate reason for the plaintiff's intervention . . . the plaintiff will be described in derogatory terms as a volunteer and cast into legal outer darkness.

Dobbs, *supra*, § 4.3.

▮▮▮▮ Subrogation, in its relationship to unjust enrichment, is best thought of as a remedy, not as an independent cause of action. *See Pulte Home Corp. v. Parex, Inc.*, 174 Md.App. 681, 742, 923 A.2d 971, 1005, *cert. granted*, 401 Md. 172, 931 A.2d 1095 (2007) ("[S]ubrogation is not a cause of action in and of itself. Rather, the doctrine of subrogation allows a party to step into the shoes of another in order to pursue a cause of action."); *Riemer v. Columbia Med. Plan, Inc.*, 358 Md. 222, 231, 747 A.2d 677, 683 (2000), *superseded by statute*, Chapter 569 of the Acts of 2000 (defining subrogation as " '[t]he substitution of one person in the place of another

with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities'" (quoting Black's Law Dictionary 1427 (6th ed.1990))); BLACK'S LAW DICTIONARY 1467 (8th ed.2004) (defining subrogation as the "equitable remedy by which ... a substitution takes place"); Restatement (First) of Restitution § 162 (1937) ("[W]here the plaintiff is not officious, and he uses his property or his property is used in discharging the obligation of another or a lien upon another's property, he is entitled to reimbursement and is entitled to the *remedy of subrogation* to obtain reimbursement.") (emphasis added); Note, *supra*, at 774 ("In truth ... subrogation is a *remedy*, to be accorded as a measure of relief from fraud or mistake, or to prevent unjust enrichment."). Although there is substantial overlap between the legal theories of unjust enrichment and subrogation, the remedy of subrogation nonetheless requires an underlying and independent legal basis upon which Cross Country may assert its claims.[21]

---

**21.** The nature of subrogation as a remedy may be illustrated best through the typical subrogation case. A homeowner enters into a contract with an insurer to insure the homeowner's property. A tortfeasor negligently or intentionally destroys the homeowner's property. The insurer compensates the homeowner for his loss and then is said to be subrogated (likely conventional subrogation by contract) to the homeowner's rights against the tortfeasor. The insurer could sue the tortfeasor under a theory of negligence or intentional torts, not under a theory of subrogation. There would be little confusion regarding the role of subrogation in this hypothetical.

The situation becomes less clear, however, in a case such as the present one, where the underlying claim is framed as one of unjust enrichment, which shares overlapping principles with subrogation. Only adding to the confusion is the fact that restitutionary actions brought at common law in assumpsit also share many principles with an unjust enrichment actions. *See Ver Brycke v. Ver Brycke*, 379 Md. 669, 698 n. 13, 843 A.2d 758, 775 n. 13 (2004) (" '[S]ome restitution claims were equitable. However, many were not. Many restitution claims were brought under the common law writ of assumpsit, using its common counts such as the count for money had and received. These claims are claims at law in every sense, first because they seek simply money relief, and second because they were historically brought in the separate law courts.' " (quoting DOBBS, LAW OF REMEDIES § 2.6(3)(2d ed.1993))).

 Assuming, *arguendo,* that Cross Country's claim is one for subrogation, the result is, nonetheless, the same. Subrogation as a remedy is particularly apt in cases where a plaintiff pays the secured debt of another and then seeks to assert the creditor's rights in the collateral. For example, in *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831 (1886), a husband with pre-existing debt purchased a piece of property financed by a purchase money mortgage. After the husband subsequently conveyed the parcel to his wife, he then convinced a friend to pay off the purchase money mortgage and accept a new mortgage in its place. The husband's creditors successfully petitioned the trial court to set aside the transfer of the property to the wife. This Court held, however, that the friend was entitled to be subrogated and hold the first mortgage position on the property.[22] *See also, e.g., Fin. Co. of Am. v. U.S. Fid. & Guar. Co.,* 277 Md. 177, 353 A.2d 249 (1976). If the particular creditor enjoys preferred rights to that of a general unsecured creditor, subrogation becomes an attractive remedy to a plaintiff. In the present case, however, neither Provident nor Stewart has any special rights against Hill that are greater than those of an unsecured claimant. Cross Country is not seeking to obtain either Provident's or Stewart's security interest in the Property. *See* Restatement (First) of Restitution § 162 cmt. g (1937) ("Where one person is entitled to be subrogated to the position of another, and the other had a claim which was not secured and not entitled to priority over the claims of other creditors, the person who is entitled to subrogation ordinarily derives no advantage from exercising his right to subrogation, since he thereby secures no advantage over other creditors, and his direct remedy against the obligor is just as good as his remedy by subroga-

---

**22.** *Milholland* also represents the interaction and overlap between the legal theories of subrogation and unjust enrichment. If the friend in *Milholland* were not subrogated to hold the first mortgage on the property, the husband's creditors would have been unjustly enriched by permitting them to recover their pro rata share of both the unencumbered property and the disbursement of the loan as general unsecured creditors. In this respect, the remedy of subrogation prevented the unjust enrichment of the creditors.

tion.") Indeed, the only security interest figuring in this case was an interest in the Property that Hill no longer owned after the fateful closing.

 Hill's argument implies that, if this case were to be decided under subrogation principles, she would be entitled to assert the defense of equitable estoppel against Cross Country. On this record, Hill is not correct.

As discussed above, equitable estoppel essentially consists of three elements: "voluntary conduct or representation, reliance, and detriment." *Mona Elec. Co. v. Shelton,* 377 Md. 320, 334, 833 A.2d 527, 536 (2003) (citing *Creveling v. Gov't Employees Ins. Co.,* 376 Md. 72, 828 A.2d 229, 246 (2003)). Hill's claim of equitable estoppel, on this record, fails because she has suffered no detriment. As a result of Provident's errors in the main, Hill received $70,261.26 more at settlement than she otherwise would have received. While acknowledging she suffered no detriment, Hill, in the same breath, asserts that Cross Country or Stewart, had Provident brought an action against them, would have been at risk of suffering detriment and therefore could have asserted equitable estoppel as a defense. Hill implies that if Provident's theoretical claims were subrogated to Cross Country, then somehow the defense available to Cross Country would be available to her. Hill offers no support for this assertion. In fact, the Maryland cases relied on in her brief stand for quite the opposite conclusion. For example, to illustrate how equitable estoppel applies in real estate transactions, Hill quotes *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners,* 380 Md. 106, 126, 843 A.2d 865, 876 (2004). The Court in *Jurgensen* noted "the party claiming to have been influenced by the conduct or declarations of another to *his injury* was himself .... "(emphasis added). *Jurgensen* requires that the party asserting the defense of equitable estoppel actually suffer the injury. Hill, on this record, appears not to have suffered injury and thus could not assert that defense. Nowhere in Hill's brief could we find persuasive authority where a seller of real estate was allowed to assert equitable estoppel against a

mortgagee who gives an incorrect payoff amount. Nowhere in Hill's brief is there tendered legal support for the assertion that when an independent obligor-plaintiff pays a third-party creditor, a defendant is entitled to all defenses that the plaintiff had against the third-party creditor. In essence, Hill seeks to employ Cross Country's financial loss (an injury) as an equitable defense.

The second implication of Hill's argument that this case should have been brought in subrogation is that Stewart and Cross Country should be considered volunteers because they paid without asserting the defense of equitable estoppel. As discussed above, Hill may argue and attempt to prove on remand that Cross Country was a volunteer as to the unjust enrichment claim.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BY THE PARTIES.**