996 A.2d 928

**Nooria NOOR**

v.

**CENTREVILLE BANK, et al.**

No. 578, Sept. Term, 2009.

Court of Special Appeals of Maryland.

June 3, 2010.

Raighne C. Delaney (James B. Davis, Juanita F. Ferguson, Bean Kinney & Korman PC, on the brief), Arlington, VA, for appellant.

Jeffrey P. Bowman (Jonathan P. Kagan, Baldwain, Kagan, Gormley LLC, on the brief), Annapolis, MD, for appellee.

Panel: DAVIS, WOODWARD and ALAN M. WILNER (Retired, Specially Assigned), JJ.

ALAN M. WILNER, J., Retired, Specially Assigned.

On May 9, 2007, appellant entered into a contract with Richland Homes, Inc. to purchase a home at 917 Bargagni Road, in Anne Arundel County. The contract anticipated that Richland would construct a new home on the lot. In fact, the home was nearly completed when the contract was signed, for settlement was set in the contract for July 20, 2007, two-and-a-half months later. The purchase price was $410,000, of which $4,000 was given as a deposit.

The contract, which was drafted by appellant's real estate agent, contained an unusual clause that lies at the heart of the principal legal issue presented to us. In the paragraph dealing with "TITLE; POSSESSION," it stated:

> "Neither legal nor equitable title shall pass until delivery of the deed. Upon payment of the unpaid purchase price at the time of settlement, a special warranty deed shall be executed by Builder, at Buyer's expense."

At the time, Richland was indebted to Liberty Savings Bank, which we assume was its construction lender and which held a first deed of trust on the property. It was also indebted to Centreville National Bank by reason of its guaranty of a line of credit the bank had extended to an entity known as RHI Meadow Creek, LLC. That liability was evidenced by a confessed judgment note.

The genesis of the dispute before us arose from events that occurred in July 2007. On July 17, Richland obtained from the county a certificate of occupancy for the property, which was the last contingency provided for in the contract. The next day, July 18, Centreville filed a complaint in the Circuit Court for Anne Arundel County against Richland and others based on its confessed judgment note. On July 19, the clerk recorded a judgment by confession against the defendants in the amount of $3,086,504, and, on July 26, personally unaware of that judgment, appellant went to settlement. She paid $422,752, being the unpaid portion of the purchase price plus expenses allocable to her, of which $260,000 came from the proceeds of a mortgage loan from Branch Banking and Trust Company. From the funds paid by appellant, $348,008 was disbursed to Liberty Savings Bank, in order to discharge its lien on the property, and the balance was paid to Richland.

Appellant took possession of the property, and nothing more of significance transpired until January 15, 2009, eighteen months later, when Centreville filed in the confessed judgment case a Request for Writ of Execution by Levy against the property. Noting that the property no longer belonged to Richland (or any other judgment debtor), the court, apparently on its own initiative, entered an order directing Centreville to show cause why a levy should be allowed on the property. Notice was given to appellant who, without objection, was permitted to intervene in order to protect her interest.[1]

Appellant's position was that, under the doctrine of equitable conversion, she became the equitable owner of the property, at the latest, on July 17, 2007, when the last contingency in the contract was resolved and she acquired the right to specific performance of the contract, and that the judgment, entered two days later, therefore could not attach to the

---

1. Maryland Rule 2–643(e) sets forth the procedure for a person, other than the judgment debtor, who claims an interest in the property to seek a release of the property from the judgment lien. Why the court chose to issue a show cause order is not clear. Later in the proceeding, appellant asked the court to treat the show cause proceeding as one under Rule 2–643(e).

property. Centreville countered that (1) the aforecited clause in the contract precluded appellant from obtaining equitable title until the property was actually conveyed to her on July 26, by which time the property was subject to the judgment lien, and (2) even apart from that clause, because the contract expressly limited her remedy in the event of a default by Richland to the return of her deposit, she never acquired a right of specific performance, and, for that reason as well, she never acquired equitable title prior to the entry of Centreville's judgment.

The issues before the court were purely legal ones. No material facts were in dispute. During the colloquy between the court and counsel, it was suggested that appellant may have a remedy against her title insurer for not picking up the Centreville judgment, which was of record at the time of closing, but the question of Centreville's entitlement to the writ of execution it sought hinged on whether, by reason of the doctrine of equitable conversion, the judgment had attached to the land prior to the conveyance of legal title to appellant on July 26, 2007. The court concluded that it did, and, on May 14, 2009, it entered a judgment to that effect and granted the request for a writ of execution. Because of other funds that had been collected on the judgment, the amount of the levy was $1,170,939.

During the hearing, counsel for appellant advised the court that, in addition to the defense of equitable *conversion*, there was a lurking issue of equitable *subrogation*—essentially that, if the judgment lien attached, appellant should be subrogated to the rights of Liberty Savings Bank, which held a lien superior to Centreville's judgment, and that the judgment lien should therefore come behind the $348,008 appellant paid to discharge the Liberty Savings Bank lien. Although counsel noted that defense in a brief footnote in his written points and authorities, he made clear at oral argument that the equitable subrogation issue was not being raised in that proceeding. He stated "that is not an issue before Your Honor today, because our only argument for saying that the judgment did not attach is the equitable conversion doctrine" and that a separate

action would be filed with respect to equitable subrogation should appellant not succeed on her equitable conversion argument. Immediately on the heels of that statement, the court orally announced its decision regarding equitable conversion and said nothing, either in its oral pronouncement or later in its written judgment, regarding equitable subrogation.

Following entry of the court's judgment, Centreville apparently took the position that the court had resolved the equitable subrogation issue against appellant, so appellant filed a motion to alter or amend the judgment seeking clarification. She asked that, if the court had "jurisdiction to decide the subrogation claim at the hearing," the judgment be revised to hold that Centreville's judgment lien is subject to a $348,008 lien to which appellant was subrogated. In a handwritten order, the court denied the motion on the ground that it "implicitly denied her claim based on equitable subrogation with the 5/14 judgment herein."

Aggrieved, appellant filed this appeal, in which she argues that (1) because of equitable conversion, the judgment never became a lien on her property, (2) the court had no jurisdiction to consider the equitable subrogation claim, (3) if it did have such jurisdiction, the court was wrong in rejecting that claim, and (4) the court erred in considering evidence that appellant might be compensated for any loss by her title insurance carrier.

## DISCUSSION

It is the two equitable issues raised by appellant that need to be substantively addressed and resolved. Before turning to those issues, however, we shall dispose quickly of the title insurance matter. Although there were some brief, and mostly oblique, references to the prospect of some recovery by appellant from her title insurance carrier, there is no indication that such a prospect in any way influenced the court's ruling on the issue of equitable conversion. We find no merit in appellant's fourth argument.

## Equitable Conversion

■ Equitable conversion is a broad, well-established principle that emanates from the maxim that "equity treats that as *being* done which *should* be done." *Himmighoefer v. Medallion Industries, Inc.,* 302 Md. 270, 278, 487 A.2d 282, 286 (1985) (quoting from 8A Thompson, Real Property, § 4447 (Grimes Replacement Volume 1963), at 273–74) (Emphasis added). Thus, as the *Himmighoefer* Court continued, in its quotation from Thompson:

> "[W]hen the vendee contracts to buy and the vendor to sell, though legal title has not yet passed, in equity the vendee becomes the owner of the land, the vendor of the purchase money. In equity the vendee has a real interest and the vendor a personal interest. Equity treats the executory contract as a conversion, whereby an equitable interest in the land is secured to the purchaser for whom the vendor holds the legal title in trust."

*Id. See also Standard Fire v. Berrett,* 395 Md. 439, 454, 910 A.2d 1072, 1081 (2006); *Washington Mut. Bank v. Homan,* 186 Md.App. 372, 974 A.2d 376 (2009).

■ One effect of this conversion is that the buyer, as holder of an equitable title or interest in the property, has a claim superior to that of a creditor who obtains a judgment against the seller subsequent to execution of the contract. *See Stebbins–Anderson Co. v. Bolton,* 208 Md. 183, 187, 117 A.2d 908, 910 (1955), confirmed in *Himmighoefer, supra,* 302 Md. at 279, 487 A.2d at 286. One well-recognized caveat to that principle, however, which also emanates from the underlying equity maxim, is that, for equitable conversion to apply, there must, in fact, be a clear duty on the part of the seller to convey the property, a duty enforceable by an action for specific performance. *See Watson v. Watson,* 304 Md. 48, 61–62, 497 A.2d 794, 800 (1985) ("The commentators are in accord that equitable conversion by contract takes place only if the contract is specifically enforceable."). If the seller's contractual duty is not subject to contingencies, equitable conversion takes effect when the contract is duly signed because the right

to specific performance accrues at that point. If there is some condition or contingency to the seller's duty to convey, however, equitable conversion would not take effect until that condition or contingency is resolved to the point that the duty can be specifically enforced.

As noted, Centreville's defense to equitable conversion is two-fold. It relies on the clause precluding the transfer of equitable title and it relies as well on other clauses in the contract that expressly limit appellant's remedy, in the event of any default by Richland, to the recovery of her deposit, thereby precluding the remedy of specific performance and thus the application of equitable conversion. We choose not to address that second argument, because we believe that the clause precluding the pre-settlement transfer of equitable title is effective to achieve that result.

The clause in question is clear and unambiguous in its intent: "Neither legal nor equitable title shall pass until delivery of the deed." [2] The only issue is whether the parties are competent, by contract, to thwart the operation of a doctrine so well-ingrained in the law. Surprisingly, there are only a few cases dealing with that issue. One of them, however, was from this Court.

In *White v. Simard*, 152 Md.App. 229, 831 A.2d 517 (2003), we had before us a situation in which the buyer at a mortgage foreclosure sale, Simard, defaulted, whereupon the property was resold at his risk. He was the high bidder at the second sale as well, and he again defaulted, although this time he was able to find an assignee willing and able to complete the sale. The price bid at the second sale, unlike that at the first, was sufficient to create a surplus—the price, even after expenses, was more than was due the mortgagee, and Simard claimed that, under the common law, he, rather than the mortgagor,

---

**2.** Appellant regards that clause, as written, as unlawful, in that legal title, in its view, would not pass until the deed is recorded. That may be so as to legal title, but, as between the parties, equitable title would pass upon delivery of the deed. *Register of Wills v. Madine*, 242 Md. 437, 442–43, 219 A.2d 245, 248 (1966).

was entitled to that surplus. Citing several decisions of the Court of Appeals, this Court agreed with him on that issue.

The problem was that the advertisements of sale, with respect to both the first and second sales, expressly provided that "[t]he purchaser shall not be entitled to any surplus proceeds or profits resulting from any resale of the property." Although recognizing that the advertisement was not, itself, a contract, the Court concluded that it did set forth the terms that would later be embodied in the contract upon acceptance of a bid by the trustees and therefore did have contractual significance. The question was whether that provision sufficed to overcome the common law doctrine entitling the purchaser to the surplus proceeds, and the Court held that it did, that a party was free to bargain away that entitlement.

More to the precise point of this case, the Court went on to hold that the fact that Simard still held equitable title to the property at the time of the resale did not require a different result. Noting that the doctrine of equitable conversion was founded on contract, the Court concluded that the determination of title, though a real estate concept, is "governed by contract law—what the parties to the transaction intended." *White v. Simard, supra,* 152 Md.App. at 247, 831 A.2d at 528. Citing *State Farm Mut. v. Nationwide Mut.,* 307 Md. 631, 643, 516 A.2d 586, 592 (1986) for the well-recognized proposition that "[a]s a general rule, parties are free to contract as they wish," the Court held that "[m]ore specifically, parties are free to contract away rights and consequences that normally would flow from the shift in equitable title arising from a contract." *White,* 152 Md.App. at 248, 831 A.2d at 528. A familiar example of that, the Court observed, was the contractual shift in the risk of loss by casualty occurring before settlement.

The Court of Appeals granted *certiorari* in *White* and affirmed the judgment of this Court, but on a different ground. In a 71–page *tour de force* on the history of mortgages dating back to the Sixteenth Century, the Court of Appeals disagreed with this Court's conclusion that Simard would have been entitled to the surplus under Maryland common law.

*Simard v. White,* 383 Md. 257, 859 A.2d 168 (2004). It therefore did not need to reach, and did not reach, this Court's holding that the doctrine of equitable conversion could be modified, or avoided, by contract.

That holding by this Court remains undisturbed and, *in the context of this case,* appears to us to remain sound. In reaching that conclusion, we are mindful of the fact that equitable conversion, as its name indicates, is an equitable doctrine, and, by creating legal consequences substantially inconsistent with those that would operate under the common law, is a far-reaching one. It must therefore take its place within the wider realms of other equitable doctrines, of basic contract law, and, depending on the context, of testamentary or trust law, which, separately or in combination, may impact on its operation. *See Coe v. Hays,* 328 Md. 350, 356, 614 A.2d 576, 579 (1992), confirming the statement from *Sands v. Church, etc.,* 181 Md. 536, 544, 30 A.2d 771, 776 (1943) that "[t]he doctrine [of equitable conversion] is not a fixed rule of law, but proceeds upon equitable principles which take into account the result which its applications will accomplish."

There may be circumstances in which a contractual provision limiting or precluding the operation of the doctrine would be inequitable and should be denied, even under basic contract law. *Cf. Baltrotsky v. Kugler,* 395 Md. 468, 480, 910 A.2d 1089, 1097 (2006), noting the general rule that parties are free to contract as they wish but pointing out that that general rule "is tempered, however, by the caveat that 'fraud, duress, mistake, or some countervailing public policy' may serve as occasions to modify or excise certain terms of a contract.'" (quoting from *Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358, 368 (1999)). *See* also *Thomas v. Dore,* 183 Md.App. 388, 404–05, 961 A.2d 655, 664 (2008), to the same effect.

■ The case law, which is relatively scant, seems consistent with the view of this Court in *White* that, as a general proposition, parties to a contract for the sale of real property may limit or preclude the operation or consequences of equitable conversion. Under that doctrine, although the seller

retains the right of possession and to receive the rents and profits from the property until legal title passes, the buyer may sell, encumber, or devise the property prior to settlement. *See* 2 John Norton Pomeroy, *Equity Jurisprudence,* (5th ed. 1941) § 368 at 23. A variety of views have developed regarding which party bears the risk of loss while the contract remains executory, but the general rule seems to be that the risk passes to the buyer. *See* 3 *American Law of Property* (1952 ed.) § 11.30; 4 Pomeroy, *supra,* § 1161a. at 480–83.

The courts have freely allowed those aspects of the doctrine to be modified by contract—to permit the buyer to take possession prior to settlement, to shift the risk of loss, to provide for insurance against that risk, to preclude the buyer from assigning the contract or engaging in activities that could result in liens or third party claims against the property. *See* 3 *American Law of Property, supra,* §§ 11.25 to 11.35. The underpinning for allowing those contractual modifications arises from the purpose of the doctrine itself. As the Court observed in *Coe v. Hays, supra,* 328 Md. at 358, 614 A.2d at 580, equitable conversion is "a theoretical change of property from realty to personalty, or *vice versa, in order that the intention of the parties,* in the case of a contract of sale, or the directions of the testator, in the case of directions in a will, *may be given effect.*" (Emphasis added). That follows Tiffany's view that the law does not favor conversions and that the equitable conversion doctrine "is not to be regarded as a formal rule of law without regard to its real purpose." 1 Herbert Thorndike Tiffany, *The Law of Real Property* (3rd ed. 1939) § 299 at 510–11.

■ If the parties express a clear intent in their contract that the doctrine not operate at all and that the status of the parties remain subject to established common law principles, absent some special circumstance that would make such a provision unlawful or inequitable, failure to implement that intent would contravene the very purpose of the conversion doctrine, to give effect to the intention of the parties.

This view is consistent with holdings in a number of other States. In *Eade v. Brownlee*, 29 Ill.2d 214, 193 N.E.2d 786 (1963), the Illinois Supreme Court dealt with a similar clause in a contract for the sale of real estate. The clause declared, in relevant part, that "no right, title, or interest, legal or equitable, in the premises . . . shall vest in the Purchaser until the delivery of the deed aforesaid by the Seller . . ." The buyer, who was in possession and had mortgaged the property, relied on equitable conversion to maintain her interest and the interest of her mortgagees. The court rejected her claim on the ground that the clause clearly showed that no equitable conversion would take place and the purchaser would take no title until delivery of the deed, and under that clause "the claim of equitable title to make mortgages is wholly defeated." *Id.* at 789. *See also Ruva v. Mente*, 143 Ill.2d 257, 157 Ill.Dec. 424, 572 N.E.2d 888 (1991); also *United States v. Capital Tax Corp.*, 545 F.3d 525, 533 (7th Cir.2008), citing *Eade* and applying Illinois law for the proposition that "[t]he doctrine of equitable conversion does not apply where equitable considerations intervene or where the parties intend otherwise."

*See also Brooks v. Council of Co–Owners*, 315 S.C. 474, 445 S.E.2d 630 (1994); but *compare In re Vinson*, 202 B.R. 972 (Bnkr.Ct.S.D.Ill.1996) (finding it inequitable to give effect to clause in land installment contract precluding transfer of equitable title until purchase price was fully paid).

We find no impediment to the enforcement of the clause reserving equitable title in Richland until delivery of the deed. As noted, the contract, including that clause, was drafted by appellant's agent. Settlement was set for, and was held, only two-and-a-half months after the contract was signed. We can find no other provisions in the contract that would make enforcement of the clause unlawful or inequitable. Under the circumstances, as the parties freely chose to preclude the transfer of equitable title prior to delivery of the deed, that choice should be respected.

### Equitable Subrogation

As noted, in a brief footnote in her Points and Authorities in opposition to Centreville's request for writ of execution, appel-

lant argued that, when she acquired the property she paid off the Liberty Savings Bank mortgage and that, therefore, "the Bank's judgment, even if it was attached to the Property, would not, in equity, be a first priority lien." She added that neither she nor her mortgagee intended to confer a benefit on Centreville. In its response, Centreville, citing *Bennett v. Westfall*, 186 Md. 148, 46 A.2d 358 (1946), argued that equitable subrogation applied only when the holder of a senior mortgage discharges it of record and contemporaneously therewith takes a new mortgage, which was not the situation at hand.

Despite those brief assertions, appellant's counsel made clear at the hearing that the issue of equitable subrogation was not being raised in that proceeding and was not before the court. That issue, he claimed, was not appropriate for resolution at a show-cause hearing or one under Rule 2–643(e). He stated: "But that is a separate suit, that is for another day." The court seemed to accept that was the case. After ruling on the equitable conversion issue, the judge said "[a]nd obviously if there is some subsequent motion that you want to file on behalf of—well on the theory of intervening other equitable subrogation or some other theory, you know, the court will cross that bridge if we get to it." No argument was made with respect to the equitable subrogation issue by Centreville. The court's written judgment did not mention the issue, or even the words "equitable subrogation."

It appears that, following entry of the judgment dealing with equitable conversion, the bank took the position that there was no subrogation, whereupon appellant filed a motion to alter or amend the judgment to clarify that matter. In a memorandum in support of the motion, appellant contended that, during the hearing she had "submitted all evidence required for the Court to rule on subrogation"—evidence showing that she had paid off a prior deed of trust having priority over Centreville's lien—but had expressed the belief that subrogation was not before the court in what was merely a show cause hearing, and that the court "did not address subrogation in its Final Judgment." Appellant stated that she

had filed a separate complaint to assert her equitable subrogation claim and that Centreville took the position that the complaint was barred by *res judicata*, and she therefore asked that the court amend its ruling and apply equitable subrogation to prevent Centreville from being unjustly enriched at her expense.

As noted, in a brief handwritten order, the court denied the motion on the ground that it had "implicitly denied" her equitable subrogation claim in the May 14 judgment At oral argument before us, appellant's counsel indicated that the subsequent complaint, which is not before us in this appeal, had been dismissed on the ground of *res judicata*, and that presents a procedural dilemma. It is abundantly clear to us from the record that the equitable subrogation issue was *not* ruled upon, explicitly or implicitly, in the May 14 judgment. Although it is true that there was evidence before the court from which it *could* have ruled on the matter, counsel made very clear that he was not presenting the issue at that hearing and neither Centreville's attorney nor the court said anything about it. The conclusion stated in the court's order denying the motion to alter or amend that the claim was considered and implicitly denied is devoid of any support in the record.

■ Ordinarily, in that situation, we would simply hold that the court erred in finding that it had decided the matter and declare the issue to be an open one. If, as appellant suggests, however, a separate complaint raising the issue was denied on the ground that the court had, in fact, decided the issue and decided it against appellant, it is not an open one. Notwithstanding the lack of any support in the record for the court's statement that it had "implicitly" decided the issue, the court acted in that belief in denying the motion to alter or amend, and we shall therefore take the court's statement as fact and thus treat the matter as being properly before us in this appeal.

Appellant's claim, of course, is that, Centreville's judgment was subordinate to the Liberty Savings Bank lien, that, by her paying off that superior lien, Centreville was enriched—placed

in a superior position—to the extent of $348,008, and that, if she is not subrogated to the Liberty Savings Bank lien, Centreville would be *unjustly* enriched. Centreville treats equitable subrogation as a purely discretionary matter with the court, as a "balancing of the equities in a particular case," and urges that the court did not abuse that broad discretion in refusing to apply the doctrine. Indeed, as it did in the Circuit Court, Centreville argues that the doctrine is limited to the situation presented in *Bennett v. Westfall, supra,* 186 Md. 148, 46 A.2d 358, "where the holder of a senior mortgage discharges it of record, and contemporaneously therewith takes a new mortgage."

 Centreville is wrong in both prongs of that defense. It is true, as a general rule, that the award of equitable relief is discretionary with the court, that a party ordinarily has no legal entitlement to an equitable remedy, and that any "right" to equitable relief is subject to counter equities that may be relevant. *See Hill v. Cross Country,* 402 Md. 281, 297, 936 A.2d 343, 352 (2007); *Roper v. Camuso,* 376 Md. 240, 260, 829 A.2d 589, 601 (2003); *State Commission v. Talbot County,* 370 Md. 115, 127, 803 A.2d 527, 534 (2002). There are limits to that discretion, however. A trial court has no discretion to misapply equitable doctrines or to refuse to apply one when the facts and circumstances of the case clearly warrant its application.

Centreville also is incorrect in suggesting that equitable subrogation is limited to the situation in *Bennett v. Westfall.* The doctrine is an aspect of the broader equitable principle of avoiding unjust enrichment. As the Court explained in *Bachmann v. Glazer,* 316 Md. 405, 412, 559 A.2d 365, 368 (1989) and confirmed in *Riemer v. Columbia Medical,* 358 Md. 222, 232, 747 A.2d 677, 682 (2000), *Podgurski v. OneBeacon Ins. Co.,* 374 Md. 133, 141, 821 A.2d 400, 405 (2003), and *Hill v. Cross Country,* 402 Md. 281, 312, 936 A.2d 343, 362 (2007), in each instances quoting from 10 S. Williston, *A Treatise on the Law of Contracts* § 1285 at 845 (W. Jaeger 3d ed. 1967):

"The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one, who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment."

The situation to which Centreville would like to limit the doctrine is certainly one in which the doctrine is often applied, and, naturally, when that is the situation before the court, it speaks of the doctrine in that context. In addition to *Bennett v. Westfall, see G.E. Capital v. Levenson,* 338 Md. 227, 657 A.2d 1170 (1995) and *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831 (1886). We have found no case, however, and Centreville cites none, in which the Court has actually limited the doctrine to that context.

■ The issue that often arises when a person pays the debt of another and seeks to be subrogated to the rights of the creditor so paid is whether the person was a volunteer or intermeddler or acted officiously, for that is when other equities may come into play. A person should not be able to recover for enriching another who did not wish to be so enriched and had no opportunity to decline the benefit. *See Hill v. Cross Country, supra,* 402 Md. at 300, n. 12, 936 A.2d at 355, n. 12. The Court of Appeals has circumscribed that caveat, however, noting that "[p]ublic policy is also best served by liberally permitting a plaintiff to be subrogated to the rights of a third-party creditor" and that when the person pays the debt of another under a mistaken impression that there was a duty to do so, courts have less reason to regard the payment as officious. *Id.* at 305, 936 A.2d at 357.

■ Unquestionably, appellant, with her own or borrowed funds, paid a debt of Richland that was superior to Centreville's judgment, and Centreville was clearly benefitted by that payment. In order to complete settlement on her contract, appellant was required to make that payment. Had she known or been informed of Centreville's judgment, she would have been entitled to delay settlement and not make that

payment until the judgment was either satisfied or removed as a lien against the property, but her lack of actual knowledge about the judgment does not render her an officious intermeddler. The fact that, had she consulted the judgment docket of the Circuit Court, appellant would have become aware of Centreville's judgment and likely would have chosen not to go to settlement had no adverse impact on Centreville. As the *Bennett* Court observed:

"[That] position is: You made a mistake, it did me no harm; in fact, resulted in greatly benefiting me. Therefore, you cannot have your mistake corrected. This position has no appeal to a court of equity."

*Bennett v. Westfall, supra,* 186 Md. at 155, 46 A.2d at 361.

This is a classic case for application of equitable subrogation. Appellant unwittingly, but quite effectively, benefitted Centreville in the amount of $348,008 by paying off the superior lien. There are no countervailing equities to subrogating her to the Liberty Savings Bank lien in that amount, for to do otherwise would unjustly enrich Centreville.

JUDGMENT AS TO EQUITABLE CONVERSION AFFIRMED; JUDGMENT DENYING EQUITABLE SUBROGATION REVERSED; CASE REMANDED TO CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH INSTRUCTIONS TO MODIFY JUDGMENT ACCORDINGLY; COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.